STATE of Oklahoma, ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,

v.

Robert G. GREEN, Respondent.

SCBD No. 4116.

Supreme Court of Oklahoma.

April 8, 1997.

STANDARD OF DETERMINATION
IN BAR DISCIPLINARY
PROCEEDINGS

Allen J. Welch, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, for Complainant.

Robert G. Green, Tulsa, for Respondent.

LAVENDER, Justice.

Disciplinary proceedings were brought against respondent, Robert G. Green, by complainant, the Oklahoma Bar Association (OBA) pursuant to Rule 6 (Formal Proceedings Before Supreme Court and Professional Responsibility Tribunal) of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 1991, Ch. 1, App. 1–A, as amended. Two counts of misconduct were charged. After hearing, a Professional Responsibility Tribunal (PRT) found misconduct under both counts. As to count 1, the PRT found violation of Rules 1.3 [1] (failure to act with reasonable diligence and promptness in representing a client) and 1.4 [2] (failure to properly communicate or explain a matter to a client) of the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S.1991, Ch. 1, App. 3–A, as amended. As to count II, violation of Rules 1.1 [3] (failure to provide competent representation) and 1.3, were found. The PRT recommended discipline of a four month suspension from the practice of law.

After *de novo* consideration, we conclude respondent engaged in misconduct in violation of Rules 1.1, 1.3 and 1.4 in regard to both counts.[4] The appropriate discipline for the misconduct is a public reprimand.

In *State ex rel. Oklahoma Bar Association v. Todd*, 833 P.2d 260 (Okla.1992), the standard of review in attorney disciplinary proceedings was set out. There we said:

In attorney disciplinary proceedings this Court's determinations are made *de novo*. The ultimate responsibility for deciding whether misconduct has occurred and what discipline is warranted if misconduct is found rests with us in the exercise of our exclusive original jurisdiction in bar disciplinary matters. Accordingly, neither the findings of fact of a Professional Responsibility Tribunal (PRT) nor its view of the evidence or credibility of witnesses are binding on us and recommendations of a PRT are merely advisory. (citations omitted)

*Id.* at 262.

In addition, to warrant a finding against a lawyer in a contested case the charges of misconduct must be established by clear and convincing evidence [Rule 6.12(c) of the RGDP; *State ex rel. Oklahoma Bar Association v. Thomas*, 911 P.2d 907, 909 (Okla. 1995)], i.e that measure or degree of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Matter of C. G.*, 637 P.2d 66, 71 n. 12 (Okla. 1981). With these standards in mind we turn to a discussion of the misconduct charged.

---

1. Rule 1.3 provides: "A lawyer shall act with reasonable diligence and promptness in representing a client."

2. Rule 1.4 provides: "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information [and] (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

3. Rule 1.1 provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."

4. The complaint filed against respondent also charged violations of ORPC Rules 1.16 (generally concerning circumstances when a lawyer shall not undertake representation of a client and appropriateness of withdrawal from representation once undertaken) and 8.4(c)(engaging in conduct involving dishonesty, fraud, deceit or misrepresentation). Complainant, Oklahoma Bar Association, essentially conceded at the hearing before the PRT that clear and convincing evidence of a violation of Rule 8.4(c) was not presented. Further, in its brief to this Court, complainant concedes no violation of Rule 1.16 was shown by clear and convincing evidence. We agree that no violations of either Rule 1.16 or 8.4(c) were shown in this matter by clear and convincing evidence.

## FACTS AND DISCUSSION

Respondent has been a member of the OBA since 1965. Both counts of misconduct concern Brown Brothers Drilling Company (BBDC), an Oklahoma general partnership formed in 1981 by members of two families, the Browns and Seigels. Partners in BBDC included Craig and Gary Brown, their father Virgil Brown, Seigel Drilling Corporation and S & S Drilling Company. BBDC's purpose was apparently drilling oil and/or gas wells for profit.

Six witnesses testified at the PRT hearing: respondent; Craig Brown; Christopher Heroux, Cleve Powell and Gary Pierson—three attorneys; and Robert Hanks, an OBA investigator. All were called on behalf of the OBA. Thirty (30) exhibits were also admitted on behalf of the OBA. In addition, respondent and the OBA entered certain stipulations referenced in the PRT's Findings of Fact and Conclusions of Law.

Although he apparently knew the Browns since the 1970s respondent was not involved in representing BBDC until early 1990. At such time Virgil suggested his sons contact respondent. Virgil did not testify at the PRT hearing because of illness—multiple sclerosis. The suggestion was apparently necessitated because the Seigel faction of BBDC had been the one primarily handling financial and legal aspects of the business, they essentially "baled out" of the partnership around such time and legal counsel they had hired would, therefore, apparently no longer be available to represent BBDC. Gary Brown was the initial person to contact respondent on behalf of BBDC. He also did not testify before the PRT.

According to respondent, his agreement with Gary in regard to representation of BBDC in general was essentially as follows: BBDC, having indicated the need to control its legal bills and expressing a general inability or, at least, difficulty in paying for legal representation, respondent would be employed only on a case-by-case or matter-by-matter basis. Respondent also asserts in his brief to this Court he never agreed to represent BBDC in any matter unless he understood BBDC could pay him for the services or it would be obligated to pay him. Respondent also testified the arrangement he had with Gary was that Gary did not want respondent to send him any bills. In sum, no written agreement concerning the representation was entered which would have spelled out the fee to be charged or the precise responsibilities of respondent as legal representative.

In total, respondent was paid $2,000.00 by BBDC, $1,000.00 in June 1990 and $1,000.00 in July 1990. The record is not completely clear for what work this money was paid to him. The record also shows respondent billed BBDC on December 30, 1991 for another $1,500.00 for professional services in November/December 1991. Respondent testified this bill was requested by Janel Love, secretary/office manager of BBDC. The record is also unclear as to exactly what services this bill was to cover, and respondent assumed Ms. Love requested it for some bookkeeping or record purpose. Ms. Love died prior to the PRT hearing and, therefore, she also did not testify at the hearing.

After respondent was contacted by Gary Brown he began to represent BBDC in a variety of legal matters beginning around March 1990. The matters included two cases involving post-judgment assistance where judgments had previously been rendered against BBDC, technical assistance on the buyout of a note BBDC had with a financial institution around June 1990 and representation before an administrative agency where BBDC was claimed to be in violation of the child labor laws (assistance occurred between December 1991 and mid-February 1992). Respondent also became involved in two cases that form the basis of the two counts of misconduct charged against him. We discuss count II first.

## COUNT II.

Count II relates to a *Kay County District Court case—Contractors Bit Service, Inc. v. Brown Brothers Drilling Company et al*, Case No. C–90–133PC. It alleges respondent was retained to represent BBDC and the individual partners in the case, but respondent failed to adequately protect the interests of Virgil Brown in the matter.

The suit was commenced in June 1990 to recover payment for bits, parts and supplies allegedly sold to BBDC.[5] BBDC and the two Brown brothers were initially sued, as well as other defendants. Respondent filed an answer on behalf of BBDC and the two Brown sons in July 1990. A first amended petition was filed in March 1991, in which Virgil was added as a defendant. As we read the first amended petition, a monetary judgment was requested not only against BBDC, but the three Browns, in addition to other defendants. The certificate of mailing on the amended petition shows mailing to respondent on March 12, 1991. Although respondent testified he did not remember when he was first made aware of it, we find nothing in the record leading to any other conclusion than respondent received the amended petition shortly after mailing.

No timely answer or other responsive submission was filed to the first amended petition. In August 1991, default judgment was taken against Virgil (and others) in the principal amount of $48,234.74, with pre-judgment interest of $10,201.64. The record shows the default judgment was mailed to respondent by certified mail with an accompanying letter from Cleve Powell (attorney for Contractors Bit) on September 5, 1991 and that respondent's then secretary signed for it the next day. As we understand respondent's testimony, he does not deny receiving a copy of the default judgment at that time.

On December 5, 1991 Powell filed a motion to have Virgil Brown disclose his assets. A hearing on assets was scheduled for December 19, 1991. Only then did respondent take any action on behalf of Virgil in the case. Either the day of the asset hearing or shortly before, respondent called Powell, informing him Virgil could not be subjected to interrogation because he was bedridden with multiple sclerosis. They agreed to postpone the asset hearing. They also agreed that because Virgil was unavailable, respondent would produce Virgil's wife and/or, at least,

one of his sons to answer questions about Virgil's assets on January 6, 1992 at 9:00 a.m. at the Courthouse in Ponca City. Respondent did not produce anyone on this latter date. Powell called respondent about his failure to honor the earlier agreement concerning producing someone to answer as to Virgil's assets. Respondent informed Powell at such time that he forgot all about the matter.

After January 6 Contractors Bit sought to garnish an account at a financial institution in Cleveland, Oklahoma, he thought might be held by Virgil. Apparently, it turned out the account was that of Virgil's wife. At some time after default judgment, the contents of a safety deposit box held by Virgil were also subjected to post-judgment examination to see if anything of value was contained therein that could satisfy the default judgment.

Not until January 31, 1992 did respondent file an answer to the first amended petition, the same date he filed on behalf of Virgil a motion to vacate the default judgment. The answer, although purporting to be an answer on behalf of BBDC only in its opening sentence, raises defenses on behalf of the individual partners and expressly responds to the first amended petition on behalf of plural defendants. At the PRT hearing respondent testified he had no recollection of ever having a discussion with Virgil or anyone else connected with BBDC about filing an answer on Virgil's behalf between the time of filing of the first amended petition in March 1991 through January 31, 1992, the date an answer was eventually filed. In fact, as far as we can determine from respondent's testimony he does not recall if he ever talked to Virgil about the case at all. At most, respondent indicated he recalled telling Gary Brown at some time during his representation that if there is a judgment against a partnership and partnership assets do not satisfy the judgment, then the assets of the individual partners are looked to, after partnership as-

---

5. One issue in the Kay County case apparently concerned whether BBDC actually received the benefit of the parts and supplies, or instead, whether the Seigel faction of the partnership, after splitting off from BBDC, was merely using BBDC's credit line to obtain the goods from Contractors Bit Service, Inc. for use in drilling activities apparently unrelated to the partnership business.

sets are exhausted.[6]

The trial court denied the motion to vacate the default judgment in June 1992. Although no money has actually been recovered from Virgil as a result of the default judgment, post-judgment proceedings based on the default judgment were initiated against him, which required either his or his immediate family's attention, that would have been unnecessary had a timely answer been filed on his behalf to the first amended petition.

■ According to American Bar Association Formal Opinion No. 91–361, although a lawyer who represents a partnership generally represents the entity, rather than the individual partners, whether a lawyer representing a partnership has an attorney-client relationship with any individual partner depends on the facts and circumstances of the particular situation. ABA Formal Op. 91–361 at 3–4. Further, even though the attorney-client relationship rests on contract, it is not necessary the contract be express or that a retainer be requested or paid. *Kurtenbach v. TeKippe*, 260 N.W.2d 53, 56 (Iowa 1977). The contract may be implied from the conduct of the parties. *Id.* Here, it is clear to us an attorney-client relationship existed between respondent and Virgil Brown in relation to the Kay County case at the time the first amended petition was filed.

Respondent's actions in filing an initial answer on behalf of BBDC and Craig and Gary Brown in July 1990, shows an understanding he represented not only the partnership, but individual partners that might be sued, at least those partners associated with the Brown family. Respondent's conduct in December 1991 through January 1992, which included his filing an answer which raised defenses on behalf of the individual partners,

and a motion to vacate the default judgment against Virgil Brown, also particularly shows respondent's recognition he represented the individual Brown partners. It is also significant that prior to filing the answer and motion to vacate default judgment on January 31, 1992, respondent apparently did not deem it necessary to discuss the matter with Virgil. This shows an understanding by respondent his representation included Virgil as an individual from the onset of the Kay County litigation. The clear conclusion from the evidence in this record is that respondent understood his representation encompassed not only the partnership as an entity, but the individual Brown partners as well, including Virgil, from the inception of his involvement in the lawsuit.

■ Given the sufficiency of the evidence that respondent represented Virgil at the time the first amended petition was filed, we conclude respondent violated Rules 1.1, 1.3 and 1.4 in relation to that representation. Professional competence, meaning acting promptly in pending matters and communicating with clients, is a mandatory obligation imposed upon attorneys licensed by this Court. *State ex rel. Oklahoma Bar Association v. Bolton*, 880 P.2d 339, 346 (Okla.1994). Failing to provide competent representation, failing to keep a client reasonably informed about the status of a matter or explaining a matter to the extent reasonably necessary to permit a client to make informed decisions regarding the representation, and failing to act with reasonable diligence and promptness in representing a client have all formed the basis for professional discipline. *See e. g. State ex rel. Oklahoma Bar Association v. Prather*, 925 P.2d 28 (Okla.1996). Further, we have specifically held that allowing a default judgment to be entered against a client

---

**6.** Part of respondent's defense to the misconduct charged against him in count II appears to be that the default judgment is void and unenforceable because no judgment had been entered against BBDC, the partnership, at the time the default judgment was rendered. His argument is, therefore, it was improper to render a judgment against individual partners as primary obligors. Whether or not this argument—which was apparently made by respondent in the motion to vacate the default judgment against Virgil Brown—is correct, misses the point of this attor-

ney disciplinary matter. Assuming the argument is legally correct, the fact a default judgment may be invalid as a substantive legal matter, cannot be used as an excuse for an attorney's neglect in failing to timely file an answer or other responsive submission on behalf of his client. Had a timely response to the first amended petition been filed, any legal issue concerning the validity of the default judgment would lack significance to Virgil Brown because there would have been no default judgment rendered against him.

because of neglect and a lack of diligence on the part of an attorney serves as the basis for a finding of professional misconduct. *State ex rel. Oklahoma Bar Association v. Maynard,* 494 P.2d 655, 657 (Okla.1972); *See also State ex rel. Oklahoma Bar Association v. Angel,* 848 P.2d 549 (Okla.1993) (failure to respond to summary judgment motion); *State ex rel. Oklahoma Bar Association v. Denney,* 617 P.2d 1351 (Okla.1980)(failure to file appeal brief resulting in dismissal of appeal).

Although the cases cited above are not exactly like the situation here, all exhibit a recognition that neglect of client matters provides a ground for finding misconduct warranting discipline by this Court. In our view, the record made before the PRT clearly and convincingly shows respondent was neglectful of his responsibilities toward Virgil Brown in the Kay County case. Respondent's failures in respect to Virgil exhibit a lack of competent representation and reasonable diligence and promptness on his behalf, and a failure to engage in reasonable communication concerning the representation. Such conduct warrants discipline by this Court.

## COUNT I.

■ Sometime in the mid–1980s a well being drilled by BBDC for TXO Production Corporation in Hughes County, Oklahoma experienced a blowout. This embroiled BBDC in a number of legal proceedings. One was *Brown Brothers, a general partnership v. TXO Production Corporation and CEI, Inc.,* Case No. C–86–78, filed in Hughes County District Court (TXO case). Although the record does not specify all allegations of the parties, one aspect of the case concerned TXO's counterclaim against BBDC for damages associated with the blowout.

The misconduct asserted as to the TXO case is essentially that respondent was retained to represent BBDC in the case after previous counsel withdrew, he failed to competently and diligently protect BBDC's interests in the litigation, and he failed to adequately communicate with BBDC or the Browns so that they could make informed decisions concerning the representation. Respondent denies he agreed to represent BBDC in the case as attorney of record. Instead, his position is the only responsibility he assumed as to the TXO case was in the limited role of "steering" TXO to any available insurance BBDC might have had to cover the damages sought in TXO's counterclaim. He also contends it was understood by BBDC and the Browns he would not enter an appearance to directly represent BBDC in the case.

In relation to count I, the OBA and respondent stipulated respondent never entered an appearance in C–86–78, filed a pleading or appeared for any hearings. After withdrawal of previous counsel any pleadings, motions, etc. were mailed to BBDC by TXO's counsel, Gary Pierson. A motion for partial summary judgment on liability (October 1990), a motion for partial summary judgment on damages (May 1992) and an application for costs and attorney fees (June 1992) were all separately filed by TXO and mailed to BBDC. Ms. Love faxed or sent these submissions and/or notice of their filing to respondent shortly after their receipt by BBDC. The fax transmittal accompanying TXO's motion for partial summary judgment as to damages was sent to respondent on June 1, 1992 with a notation for respondent to "[p]lease handle and advise". The evidence is clear the May–June 1992 submissions of TXO were received by respondent prior to any responsive date that may have been applicable to them and that respondent was given notice of the October 1990 motion for partial summary judgment on liability prior to a responsive date.

No responses were filed to TXO's motions by or on behalf of BBDC and in December 1990 partial summary judgment on liability was granted in favor of TXO, in June 1992 a judgment in the amount of a little over $318,-000.00 was entered against BBDC and an order granting costs and attorney fees in favor of TXO was entered in July 1992 of about $26,500.00. Post-judgment proceedings were then instituted which had the effect of seizing or freezing BBDC funds used to make its payroll. Although new lawyers were brought in at such time and the TXO case has now been settled, the partnership,

as well as the two Brown brothers, took bankruptcy and apparently the assets of BBDC were sold to pay off their creditors.

Aside from Ms. Love, respondent had no recollection of discussing the TXO case with anyone at BBDC other than Gary Brown. Although respondent's testimony in regard to the matter was not the model of clarity, he testified that in the latter part of 1990 he reviewed the file in the case. The record also shows he had two or three telephone conversations with Gary Pierson regarding the case and the possibility of BBDC having insurance coverage for the blowout apparently with either USF & G or Lloyd's of London. One central issue of their discussions appears to have been why one and/or the other of these insurance carriers was not defending TXO's counterclaim against BBDC. Further, respondent mailed certain insurance policies of BBDC to Pierson in November 1990 and he appears to have assisted, through discussion with Pierson, in striking one hearing that had been set on the motion for partial summary judgment regarding BBDC's liability. The record also indicates respondent talked briefly with counsel for one of the insurance carriers, but does not show the substance of the conversation.

As we understand respondent's position his view is he essentially determined not to enter an appearance in the TXO case for the following reasons. BBDC's contract made them liable for the blowout and, thus, it had no defense to the lawsuit, and because litigation of the case would be both extensive and expensive BBDC's difficulty or inability to pay for legal expenses did not warrant any defense to the suit. Respondent also appears to assert he did not agree to represent BBDC in the TXO case because he was never assured BBDC could pay him for such representation. He also testified it was his understanding BBDC considered itself judgment and liable proof by virtue of all partnership, and possibly, individual partners' property, being collateral for a partnership loan at a financial institution in Bristow, Oklahoma. Respondent also testified his understanding was that BBDC had no funds available to settle or buy off any type of program with TXO.

The record is unclear as to just exactly what discussions respondent had with Gary Brown concerning his representation of the partnership in the TXO matter. Further, as we construe respondent's testimony he had no present recollection of ever having talked to anyone at BBDC about the TXO submissions for summary judgment or attorney fees (except possibly Ms. Love) or explaining to anyone the consequences of failure to appear at hearings on the motions for partial summary judgment or the application for attorney fees, i.e. that enforceable judgments/orders might be entered against BBDC, even though respondent acknowledged in his testimony before the PRT the submissions were being sent to him by BBDC to see if anything could be done about them. Although respondent testified he might have talked to someone at BBDC about one or more of the submissions or motion dockets set thereon, it is impossible to tell from his testimony what the substance of any such conversations might have been. It is, however, respondent's position he told BBDC (presumably Gary Brown), apparently prior to his receiving any of the above submissions of TXO, that he was not going to enter an appearance in the case. Respondent also testified that because they had previous counsel, and had been involved in other litigation where BBDC had worked out an agreed judgment without representation, that BBDC knew the consequences of failure to appear or respond to TXO's submissions. Respondent also testified that because Gary Brown had told him that BBDC had no money to employ counsel, there was no point in him telling anyone at BBDC to hire counsel to appear at any motion dockets. Respondent's view was also that BBDC knew he was not representing the partnership in the litigation because the partnership was actually receiving the TXO submissions, rather than him.

In our view, respondent's testimony concerning limitation of the representation was inconsistent and uncertain. At one point in his testimony, rather than agreeing merely to "steer" TXO to BBDC's insurance, respondent testified he was attempting to **resolve**

the issue of whether or not there was insurance. Other testimony of respondent also exhibited uncertainty as to exactly what was the scope of his representation in regard to the TXO matter. At one point he essentially testified he **"guess[ed] maybe"** his process was because of the lack of resources of BBDC he was attempting to encourage TXO to pursue the insurance carrier. There is a marked difference between merely "steering" the opposing counsel in a lawsuit to your client's insurance carrier or encouraging action by your opponent in such regard and agreeing to attempt to resolve the issue of whether or not insurance coverage was actually available to your client.

Respondent appears to have done little to actually resolve the issue of whether or not insurance coverage was available to his client in regard to the TXO case from the fall of 1990 (the latest time the evidence shows he began discussing the case with Gary Pierson) and June–July 1992, when the judgment for monetary damages and order on attorney fees were entered against BBDC, a period of about nineteen (19) months. Furthermore, even if respondent was leaving it up to Pierson to pursue or deal with BBDC's insurance carriers, we can find nothing in this record that would support a reasonable conclusion he ever communicated this "delegation" to Pierson or that he ever took any reasonable or sensible steps to determine himself the status of any efforts that may have been undertaken by TXO's counsel in regard to insurance coverage.

Respondent also testified he did not remember having any discussion with Craig Brown regarding the TXO case. However, Craig Brown testified he talked to respondent on more than one occasion (the record appears to indicate 5–6 times) concerning the matter and each time respondent told him words to the effect, don't worry about it, that he, respondent, would take care of it. Although Craig did discuss the issue of insurance coverage with respondent, it was Craig's clear understanding that respondent was acting as BBDC's attorney in regard to the TXO lawsuit during the relevant time period.

In his brief to this Court respondent quotes the following portion of Rule 1.2(a) of the ORPC to support his position of limited representation: "A lawyer shall abide by a client's decisions concerning the objectives of representation...." He also relies on the comment to Rule 1.2 to argue a lawyer should defer to the client in regard to such questions as the expense to be incurred and that the objectives or scope of the services to be provided by the lawyer may be limited by agreement. Respondent's reliance on Rule 1.2(a) and the comment is misplaced because respondent's position fails to consider all of the pertinent parts of Rule 1.2 or the comments to that Rule. The pertinent parts of Rule 1.2 provide as follows:

(a) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (b), (c), and (d) and **shall consult** with the client as to the means by which they are to be pursued....

(b) A lawyer may limit the objectives of the representation **if the client consents after consultation.** (emphasis added)

The terms consult or consultation are defined in the terminology section of the ORPC as, "denotes communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question." The comment to Rule 1.2 further provides that although the scope of the representation may be limited, "the client may not be asked to agree to representation so limited in scope as to violate Rule 1.1 ....", i.e. a lawyer may not ask a client to agree to representation so limited in scope that such limited representation would itself amount to incompetent representation. The consultation requirement of Rule 1.2(b) dovetails with Rule 1.4(b) which requires that a lawyer explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. The requirement of explanation, i.e. consultation, is required so that the client will understand the dangers that may be inherent in contracting for limited legal services. G.C. HAZARD, JR. & W. WILLIAM HODES, THE LAW OF LAWYERING: A Handbook on the Model Rules of Profession-

al Conduct 24–25 (1985). The responsibility for clarifying the scope of the representation rests on the attorney. THE LEGISLATIVE HISTORY OF THE MODEL RULES OF PROFESSIONAL CONDUCT: Their Development in the ABA House of Delegates 32 (1987).

■ Although an attorney only has an obligation to provide those services for which he was hired [*Federal Deposit Insurance Corporation v. Ferguson*, 982 F.2d 404, 407 (10th Cir.1991)], for Rule 1.2 to act as a successful defense in this disciplinary proceeding it must be shown respondent adequately consulted with BBDC, explaining the consequences of limitation of his representation to only steering the opposing party in the case to available insurance coverage held by BBDC or, as respondent also characterized the scope of his representation in his testimony, resolving the question of whether BBDC had insurance coverage applicable to the TXO case. The evidence presented to the PRT clearly shows respondent did not adequately consult with BBDC regarding the representation and any limitations he asserts were placed on the scope of that representation.

Even though representation of an organization, like a partnership, presents special problems in the area of a lawyer's duty to intelligently consult with the client, a lawyer, in carrying out his responsibilities of communication and explanation, should ordinarily address communications to the appropriate officials of the organization. Rule 1.4, Comment. Although in representation of an organization it will often be impossible or inappropriate to inform every one of its members about its legal affairs [*Id.*], in the circumstances of this case Craig Brown was one person that respondent should have explained the scope of his representation. This is so because it is clear to us Craig reasonably relied on respondent to represent BBDC in the TXO case, respondent must have known of such reliance or he is chargeable with such knowledge, and it was, therefore, respondent's duty to clarify the matter with Craig Brown.

■ Notwithstanding respondent's lack of memory concerning discussion of the TXO case with Craig Brown, we find respondent had more than one conversation with Craig regarding the representation. From these conversations, from the fact he was being sent dispositive submissions of TXO that he testified were being sent to him to see if anything could be done about them—one of which actually requested that he handle and advise—and the fact of his representation in other partnership matters during this same time period, we conclude respondent must have known (or, again, he is chargeable with knowing) Craig believed respondent was representing BBDC in the case in more than a limited capacity. In appropriate cases, an attorney may be found to have impliedly agreed to provide legal services when the person seeking them reasonably relies on the attorney to provide the services, and the attorney, aware of the reliance, does nothing to negate the belief. *Kurtenbach v. TeKippe, supra,* 260 N.W.2d at 56; *See also Rhode Island Depositors Economic Protection Corp. v.* Hayes, 64 F.3d 22, 27 (1st Cir.1995)(reliance must be objectively reasonable under all the circumstances); *Rice v. Forestier,* 415 S.W.2d 711, 713 (Tex.Civ.App.1967)(under certain circumstances attorney representing client in one matter may be under duty to inform client he is not going to file answer in another matter). Here, we find Craig Brown had an objectively reasonable belief respondent was representing BBDC in the TXO case in more than a limited fashion, he reasonably relied on respondent to handle the matter and respondent, thus, had a duty to clarify the situation. Nothing in this record convinces us respondent ever adequately consulted with Craig concerning the representation and, in fact, it appears respondent merely led Craig to believe he was taking care of the TXO case.

Respondent's further assertion concerning BBDC's lack of defense to the TXO case provides no shield to a determination he is guilty of professional misconduct. If there was in reality no defense, that was simply another matter that should have been discussed with or explained to the client so that informed decisions could be made on how to proceed. *See State ex rel. Oklahoma Bar Association v. Angel, supra,* where we disci-

plined a lawyer for failing to take some action with respect to a motion for summary judgment filed against his client by either advising the client of a lack of basis for opposing the motion or responding to it in some fashion.

Even if the representation by respondent of BBDC could be considered properly limited in some fashion as asserted by him, this record still clearly supports a determination of professional misconduct on his part. Nothing in the record would sensibly support a conclusion respondent took any reasonable prompt or diligent steps to resolve the issue of insurance coverage of BBDC for the TXO case, particularly given respondent's knowledge that TXO was filing submissions in the case requesting judgments or orders totaling well over $300,-000.00 against his client. The record, instead, clearly and convincingly supports a lack of prompt or diligent conduct. As noted above, during the approximate nineteen (19) months between respondent's initial involvement in the matter in the fall of 1990 until the granting of TXO's motion for partial summary judgment on damages in June 1992, respondent did little to actually resolve the issue of whether or not there was insurance coverage. Further, even if his representation was actually limited to "steering" or encouraging TXO to pursue any BBDC insurance coverage—and such a severe limitation on the scope of the representation would not itself be considered incompetent— the evidence is clear and convincing this was not actually communicated to Gary Pierson, TXO's counsel and it is clear respondent did not take, under such a scenario, any reasonable or sensible steps to keep himself informed about the status of such efforts on Pierson's part consistent with the interests of his client.

In sum, respondent's failure of reasonable consultation in relation to count I and his lack of diligence and promptness in representing the interests of BBDC amounts to conduct in violation of Rules 1.4 and 1.3. His failures also amount to incompetent representation in violation of Rule 1.1.

## DISCIPLINE

This Court has imposed varying degrees of discipline upon lawyers who have neglected client matters. A listing of many of the cases is contained in *State ex rel. Oklahoma Bar Association v. Busch,* 832 P.2d 845, 847–848 (Okla.1992). Discipline imposed in the cases cited in *Busch* ranged from public censure to a two year suspension. *Id.* In fact, after *Busch* we imposed suspension for longer than two years when it was deemed necessary to carry out our responsibility to safeguard the public interest and protect the judicial system. *See e.g. State ex rel. Oklahoma Bar Association v. Evans,* 880 P.2d 333 (Okla.1994).

It was also noted in *Busch* that this Court has indicated in previous cases public censure or reprimand is an appropriate discipline when an attorney is guilty of neglect of a legal matter without affirmative acts of harmful conduct against the client. 832 P.2d at 848; *State ex rel. Oklahoma Bar Association v. Borders,* 777 P.2d 929 (Okla.1989). In the instant matter, taking into consideration our previous cases, our duty to protect the public and the integrity of the judicial system, we conclude the appropriate discipline for respondent's misconduct is a public reprimand.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that respondent, Robert G. Green, shall stand subject to public reprimand by the publication of this opinion for the reasons previously set forth.

IT IS FURTHER ORDERED that respondent shall pay the costs of this proceeding in the amount of $1,623.86 within ninety (90) days of the date this opinion becomes final.

KAUGER, C.J., and HODGES, OPALA, ALMA WILSON and WATT, JJ., concur.

SUMMERS, J., concurs in result.

SIMMS, J., disqualified.

HARGRAVE, J., not participating.