2003 OK 56

**STATE of Oklahoma, ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Michael C. TAYLOR, Respondent.**

No. 4615.

Supreme Court of Oklahoma.

May 27, 2003.

Loraine Dillinder Farabow, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma for Complainant.

Respondent, Michael C. Taylor, appearing pro se.

LAVENDER, J.

¶1 Complainant, the Oklahoma Bar Association (OBA) brought disciplinary proceed-

ings against respondent, Michael C. Taylor under Rule 6, Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.2001, Ch. 1, App. 1–A, as amended. A Professional Responsibility Tribunal trial panel (PRT) found respondent violated the RGDP and the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S.2001, Ch. 1, App. 3–A, as amended, and recommends a public reprimand.[1] We hold respondent engaged in misconduct, a public reprimand is warranted and he should pay the costs of these proceedings.[2]

## PART I. STANDARD OF REVIEW.

¶ 2 The review standard in attorney disciplinary cases is as follows:

In attorney disciplinary proceedings [our] determinations are made *de novo*. The ultimate responsibility for deciding whether misconduct has occurred and what discipline is warranted if misconduct is found rests with us in the exercise of our exclusive original jurisdiction in bar disciplinary matters. [N]either the findings of fact of a [PRT] nor its view of the evidence or credibility of witnesses are binding on us and [its] recommendations ... are merely advisory. (citations omitted)

*State ex rel. Oklahoma Bar Ass'n v. Todd*, 1992 OK 81, 833 P.2d 260, 262. Even when the parties' stipulate to misconduct, the stipulations do not bind us for our duty is to review the evidence *de novo* to decide if misconduct allegations are established by clear and convincing evidence [*State ex rel. Oklahoma Bar Ass'n v. McGee*, 2002 OK 32, ¶ 20, 48 P.3d 787, 792], i.e, a degree of proof producing in the mind of the trier of fact a firm belief or conviction of the truth of the allegations sought to be established. *State ex rel. Oklahoma Bar Ass'n v. Green*, 1997 OK 39, 936 P.2d 947, 949. The review is a full-scale exploration of all relevant facts

[*State ex. rel. Oklahoma Bar Ass'n v. Doris*, 1999 OK 94, ¶ 3, 991 P.2d 1015, 1017] and requires a complete record be made before the PRT, one sufficient for an examination of all pertinent issues, a thorough inquiry into all essential facts, and the crafting of appropriate discipline. *Id.* The record is adequate for such *de novo* review.

## PART II. OVERVIEW, FACTS AND BACKGROUND.

¶ 3 A hearing, at which respondent testified and 117 exhibits were admitted, was held before the PRT. The record includes the hearing transcript, the complaint against respondent, his answer and the PRT's written report, with the parties' joint stipulations attached.[3] The stipulations are detailed, containing fifty-six (56) numbered sentences or paragraphs that span twenty (20) pages. They are broken down into three counts, include sections on agreed aggravating and mitigating circumstances, a discipline recommendation and other matters the parties deem pertinent. No need exists to set out the entirety of the stipulations. It will suffice to discuss them as required to execute our duty to decide if respondent violated pertinent Rules and, if so, the discipline warranted. A joint brief-in-chief and waiver of further briefs was filed by the parties with this Court.[4]

¶ 4 Respondent stipulates he violated Rule 1.15(b)-(c), ORPC, that provide:

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client

---

1. We cite to the current Rules Governing Disciplinary Proceedings (RGDP) (5 O.S.2001, Ch. 1, App. 1–A, as amended) and Oklahoma Rules of Professional Conduct (ORPC) (5 O.S.2001, Ch. 1, App. 3–A, as amended). No amendments to pertinent Rules have occurred since the relevant time period covering the conduct of respondent, Michael C. Taylor.

2. Rule 6.16, RGDP provides that where discipline is imposed, the costs of the investigation, record and disciplinary proceedings shall be surcharged against the disciplined lawyer, unless

remitted for good cause by this Court. No good cause for remission has been shown.

3. The parties' written joint stipulations was also an exhibit admitted at the Professional Responsibility Tribunal trial panel (PRT) hearing, as were the complaint and respondent's answer.

4. The facts recited are shown by clear and convincing evidence, considering the parties' joint stipulations and the evidence in the record.

or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.[5]

He also stipulated to violating Rule 8.4(c), ORPC, that provides: "[i]t is professional misconduct for a lawyer to ... engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" Although the parties stipulated to its violation, we do not find clear and convincing evidence respondent violated Rule 8.4(c). We do find he violated Rule 1.15(b)-(c) by the way he handled personal injury settlement funds he received while representing a client, Jamie Herdt.[6]

¶ 5 The case springs from respondent's representation of Ms. Herdt who, in 1997, was injured while a passenger in a vehicle hit by a drunk driver in Texas. Her injuries required treatment, she incurred medical bills and was initially represented by a Texas attorney, Hank Anderson. The record reveals medical bills totaling about $45,600 and involving, at least, thirteen (13) medical providers located in Texas. Also, as we read the record, Ms. Herdt's medical bills actually exceeded $50,000, but the additional bills are not detailed in the record. Further, although the joint stipulations sometimes refer to medical provider liens in the plural, as we read the parties' stipulations, coupled with respondent's testimony and the exhibits admitted at the PRT hearing, respondent was aware of only one medical provider having a lien in its favor at the time he disbursed certain settlement funds in late November-early December 1999. The lienholder was United Regional Health Care System (URHCS)(also known as Wichita General Hospital), URHCS having a statutory hospital lien under Texas law.[7] The parties stipulated that Texas law governs as to whether a medical provider or lienholder may make a claim to settlement proceeds paid by under-insured/uninsured (UM) benefits—the stipulation, in effect, based on the fact the acci-

---

5. Although respondent is not charged with its violation we set forth Rule 1.15(a), ORPC, which is as follows:

   a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

6. The joint stipulations also agree respondent violated Rule 8.4(a), ORPC and Rule 1.3, RGDP, and the PRT found violation of said Rules. The latter provides:

   The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in

a criminal proceeding is not a condition precedent to the imposition of discipline.
   Rule 8.4(a), ORPC provides: "[i]t is professional misconduct for a lawyer to ... violate or attempt to violate the [ORPC], knowingly assist or induce another to do so, or do so through the acts of another[.]" The charging of violation of these two Rules, stipulation he violated them and the PRT's finding of violation, in our view, involves no transgression additional to his conduct violative of Rule 1.15(b)-(c), ORPC. No need exists to further discuss Rules 8.4(a), ORPC or 1.3, RGDP.

7. A January 10, 2000 letter to respondent from a law firm representing a second hospital, Baylor University Medical Center (BUMC), was an exhibit admitted at the PRT hearing. The letter asserts BUMC also had a lien running in its favor. The parties' joint stipulations do not mention the letter and its significance is not adequately explained (though mentioned) at the PRT hearing. The record is not clear as to 1) whether BUMC actually had a properly filed lien under Texas statutory law or 2) whether, if it did, respondent was aware of the lien in late November-early December 1999. The record is clear, however, that respondent knew BUMC had an outstanding medical bill in the Jamie Herdt matter at said time, a bill the record indicates was close to $14,000.

dent occurred and pertinent medical services were received in Texas. Although the parties have not so formally stipulated, in our view, it would also appear to be Texas law that would govern whether a medical provider or lienholder had a legitimate claim to any liability insurance settlement proceeds received by respondent.

¶ 6 In 1999 Ms. Herdt moved to Oklahoma, terminated Anderson and hired respondent. This case is fairly unusual because the initial grievance to the OBA against respondent was by Ms. Herdt. In effect, she asserted a lack of communication on respondent's part, his alleged failure to completely account to her for all settlement proceeds received by him and frustration about being contacted by collection agencies regarding outstanding medical bills. During the disciplinary process the matter underwent metamorphosis into charges of misconduct about respondent's treatment of third-party medical providers of Ms. Herdt respecting settlement funds he received. The case is also unusual because although the substantive law of Texas appears applicable to the underlying question of competing disputants' entitlement to settlement proceeds received by respondent, the ethical obligations of respondent are measured by adherence to the ORPC and the RGDP, i.e., Oklahoma's professional standards governing a lawyer's conduct.

¶ 7 In September 1999 Allstate Insurance Company (insurer for the vehicle owner in which Herdt was a passenger) issued a settlement check for $50,000 for UM benefits payable to Herdt and Anderson. The check was mailed to Herdt, given by her to respondent, and with Herdt's and Anderson's permission respondent endorsed and deposited it to his trust account in late September 1999. Respondent also negotiated a settlement for $20,000 with the tortfeasor's insurer, Geico Insurance Company. He requested two checks be issued by Geico, one for $12,417.81, the amount of URHCS's lien. He asked that check be made payable to him, Herdt and URHCS and that a second check for the remainder ($7,582.19) list him, Herdt and

Anderson as payees.[8] The two checks issued and respondent received them about November 23, 1999.

¶ 8 The $12,417.81 check was held by respondent, i.e., not deposited to his trust account or any account controlled by him. Eventually, about August 24, 2000, respondent gave the check to Herdt's new attorney, i.e., nine months after he received it, Herdt having terminated respondent in July 2000. Respondent was unable to deposit the check to his trust account as URHCS never agreed to endorse it because no agreement was reached regarding their medical bill and lien. The $7,582.19 check was deposited to his trust account on or about November 23, 1999.

¶ 9 Prior to disbursal of any of the above sums, Herdt, Anderson and respondent agreed the two attorneys would equally share a 40% fee on the gross settlement proceeds collected. There is also clear and convincing evidence that although respondent did not know what Texas law was as to whether medical providers, lienholder or not, could rightfully claim an interest in the liability or UM proceeds received or, if so, the extent of any such interest, nor did he know, under Texas law, the appropriate disposition of the liability proceeds check in the amount of URHCS's lien or the extent URHCS could rightfully claim an interest therein, on November 24, 1999 he disbursed monies (by check) from his trust account in regard to the Herdt matter as follows:

1. $10,000 to Anderson—the check indicating it was for half the attorney fees owed to Anderson from the $50,000 UM settlement proceeds received, i.e., 20% of $50,000 = $10,000;

2. $1,435.10 to Anderson to reimburse him for costs he had incurred in the Herdt case;

3. $10,000 to respondent's operating account—the check indicating it was for half the attorney fees owed from the $50,000 UM settlement proceeds received, i.e., 20% of $50,000 = $10,000; and

8. Geico Insurance Company's attorney—aware of the United Regional Health Care System (URHCS) lien—required that the lien amount

check be paid either by separate draft to URHCS or a draft including URHCS as a co-payee.

4. $10,000 to Ms. Herdt—the check indicating it was for "partial settlement payout".

Still being unaware of Texas law as to the proper disposition of said funds, on December 1, 1999, he disbursed monies (by check) from his trust account in regard to the Herdt matter as follows:

1. $3,791.09 to Anderson for half the attorney fees from the Geico check deposited into his trust account; and

2. $3,791.10 to respondent's operating account for his half of the attorney fees from the Geico check deposited into his trust account.

¶ 10 The parties stipulate that after assuming Herdt's case respondent contacted the various medical providers and insurance carriers in an effort to settle the matter, and that prior to disbursing the above amounts he attempted to negotiate with URHCS and the other medical providers to determine their willingness to reduce their bills so that Herdt would be able to receive a portion of the settlement funds. No agreement was ever reached in said regard, however. Further, even though the record shows respondent's unawareness of exactly what Texas law was on the subject, he took the position with the medical providers, lienholder or not, that each was only entitled to a proportionate share of the liability proceeds after his and Anderson's attorney fees and costs were deducted therefrom, i.e., a figure he calculated to be about $10,000. In other words, his position was all medical providers were entitled to only their proportionate share of $10,000 and as to URHCS, said entity was not entitled to be paid the full amount of its lien because he and Anderson were entitled to forty (40%) percent of the $20,000 liability proceeds for their attorney fees plus costs.[9] As to the UM proceeds, again being unaware of exactly what Texas law was on the subject, he took the position none of the providers were entitled to any portion of the UM proceeds.

¶ 11 As it turns out respondent appears to have been, at least, partially wrong concerning entitlement to the liability proceeds because under Texas law the lienholder, URHCS (assuming it was the only medical provider having a statutory hospital lien on the liability proceeds, and no other provider had some type of superior interest to the proceeds) was probably entitled to recover the full amount of its lien from the check on which it was co-payee. *See Bashara v. Baptist Memorial Hospital System*, 685 S.W.2d 307 (Tex.1985)(where personal injury settlement proceeds are sufficient to pay both attorney fees and lien of hospital attorney not entitled to reduce amount of hospital lien to recover attorney fees out of funds from liability insurance proceeds allocated to payment of hospital lien).[10] Contrariwise, respondent appears to have been correct, under Texas law, that unsecured medical providers and URHCS (assuming no assignment by Herdt of an interest in the UM proceeds to any medical provider or some agreement by respondent and Herdt with them that medical bills would be paid from the UM proceeds) had no entitlement or valid claim of interest to any portion of the UM proceeds.[11] However, as noted above, when dis-

9. At such time, of course, respondent had already paid himself and Anderson all of the attorney fees they had agreed were due except for about $420 which, in essence, he for some reason believed he was entitled to from the check he was holding on which URHCS was a co-payee even though there was money remaining from the UM proceeds to cover this additional amount of attorney fees.

10. The settlement proceeds involved in *Bashara v. Baptist Memorial Hospital System*, 685 S.W.2d 307 (Tex.1985) seem to have come only from the tortfeasor's liability carrier, rather than part from liability insurance and part from underinsured/uninsured (UM) insurance. However, in the present matter because respondent, Herdt and Anderson had agreed that Anderson and respondent would equally share a forty (40%) fee on the gross settlement proceeds received, i.e., $70,000, this gross amount was sufficient to pay the attorney fees ($28,000 = 40% of $70,000) and the liability check for the amount of URHCS's lien ($12,417.81) would still have been available for the full amount of the lien. There appears to have been no reason for respondent to take the position or attempt to convince URHCS that he was entitled to attorney fees out of the check in the amount of the lien. As we view the record he did so, in large part, because he really did not know what Texas law was on the subject.

11. Under Texas law insurance proceeds from UM coverage are not subject to a statutory hospital lien. *Members Mutual Insurance Company v.*

tribution was made respondent did not know what Texas law was and it was improper to distribute the funds as he did, including distribution of attorney fees to himself and Anderson, with such a state of affairs existing.[12]

¶ 12 The record also contains clear and convincing evidence that prior to receiving the two checks totaling $20,000 from Geico respondent agreed with Geico's attorney to 1) pay Herdt's medical bills from said proceeds, or 2) work out agreement with each and every one of the medical providers concerning what part of said proceeds would be paid to them, or 3) barring such an agreement with each and every provider in said regard, he would submit the matter of the proceeds' distribution to the Texas court where a lawsuit had been filed by Herdt against the tortfeasor for that court to determine a proper distribution of the funds.[13] Respondent did not honor this agreement as he failed to submit the issue to the Texas court after it became clear no agreement was going to be reached with each and every provider that had rendered treatment to Ms. Herdt for her injuries. Furthermore, respondent used part of the proceeds for a portion of the attorney fees ($3,791.10) he was owed in the matter, as well as paying Anderson part of the proceeds for a portion of the attorney fees ($3,791.09)

Anderson was owed for his representation of Ms. Herdt.

¶ 13 Although respondent wrote to each medical provider in early December 1999 informing them he had received $20,000 in liability proceeds and $50,000 in UM proceeds he failed at that time to inform any of them, including URHCS, that he had the day before issued checks to himself and Anderson out of the liability proceeds to pay part of the attorney fees due himself and Anderson, or that in late November 1999 he had given $10,000 each to himself and Anderson for attorney fees, and $10,000 to Herdt from the UM proceeds. Respondent, in effect, has agreed he knew at the time it was improper to have given Herdt any money without an agreement from all the medical providers because one or more of the medical providers were making claim to part of the settlement proceeds. Respondent gave Herdt the $10,000 as a humanitarian gesture as she was in need of a vehicle for transportation. We note that because the record shows respondent did not know what Texas law was concerning an appropriate disposition of any of the settlement proceeds it was plainly improper for him to distribute the proceeds as he did.

¶ 14 The record also clearly and convincingly shows that respondent, with respect to the check he held on which URHCS was a

---

*Hermann Hospital,* 664 S.W.2d 325 (Tex.1984). We need not deeply delve into Oklahoma law on the subject, but note that in *Kratz v. Kratz,* 1995 OK 63, 905 P.2d 753, this Court held that under our hospital lien statute such a lien could not be enforced against UM benefits paid by the patient's own insurer. Further, there may be many and varied situations where an attorney and his client voluntarily agree with medical providers that the latter will be paid from settlement recovery proceeds. *See e.g. The Florida Bar v. Silver,* 788 So.2d 958 (Fla.2001)(attorney, with client's consent, may send letters of protection to one or more medical providers, i.e., agree to pay them from settlement proceeds). The attorney and client may so agree with one or more medical providers to forestall collection efforts against the client or to insure the client continues to receive medical treatment from a provider, or for other valid reason. *See* White, *The Dishonored Medical Lien: A New Trend in Bar Complaints,* 25 Ariz.Att'y 17, 18 (June 1989). It does not take much imagination to recognize that such an agreement might be structured in a way to include UM proceeds. The record in this matter

does not show by clear and convincing evidence that such an agreement including UM proceeds existed nor does the Oklahoma Bar Association (OBA) so allege.

12. Respondent's testimony at the PRT hearing seems to indicate that before disbursal of any funds he had obtained some knowledge of Texas law as to the propriety of paying his and Anderson's attorney fees. His testimony also indicates he had a generalized view that an attorney's lien was superior to any purported claim to personal injury settlement proceeds of a medical provider that had rendered treatment to the personal injury victim. Notwithstanding such testimony, as we view the overall record, when respondent disbursed the funds as he did he was unsure of the proper course for distribution under Texas law, including distribution of the funds for his and Anderson's attorney fees.

13. When the settlement proceeds were received in 1999, the lawsuit mentioned in the text was pending in the district court of Wichita County, Texas.

co-payee and the remaining UM proceeds not distributed, charted a course of merely trying to wait out the medical providers in an effort to get them to reduce their bills. He held the check and the remaining funds for approximately nine months, when in late August 2000, as above-noted, he turned the check and the remaining UM funds ($18,-564.90) over to Herdt's new attorney. In fact, a late June 2000 letter from respondent to Ms. Herdt tells her that because all providers have not agreed to sufficiently reduce their bills, it appears she will not be receiving additional monies and that the situation concerning remaining settlement funds was "in a stalemate position." As we read the letter respondent was also telling Herdt that any resolution concerning an appropriate distribution of the remaining settlement funds was "going nowhere" and no one would receive any of the funds until all providers agreed to sufficiently reduce their claims against Herdt and to dismiss all the medical provider claims against her. The letter also quite plainly expresses the view that respondent was going to remain in this stalemate situation "indefinitely" if all providers would not agree to reduce their bills and release their claims against Herdt. This stalemate situation existed when respondent released the check and funds he was still holding to Herdt's new attorney, i.e., for a nine month period respondent neither distributed the remaining liability or UM proceeds to any medical provider or Ms. Herdt nor did he take those steps, either in Texas or Oklahoma, to resolve the matter through an appropriate court proceeding, e.g., an interpleader proceeding.

¶ 15 The parties' stipulations have agreed to certain aggravating and mitigating circumstances. In essence, the aggravating circumstance is that respondent was suspended from the practice of law for thirty (30) days in May 2000 for similar, though not identical,

conduct concerning a medical provider that had an interest in certain settlement proceeds received by respondent in his representation of a personal injury client. *See State ex. rel. Oklahoma Bar Ass'n v. Taylor (Taylor I)*, 2000 OK 35, 4 P.3d 1242.[14] Somewhat negating the efficacy of *Taylor I* as an aggravating circumstance are further stipulations that the occurrences giving rise to the Herdt matter and the matter in *Taylor I* were proximately close in time. The Herdt misconduct began in late November 1999, **prior to** this Court's opinion in *Taylor I* (May 9, 2000), and the misconduct in *Taylor I* occurring from November 2, 1998 through June 21, 1999. Because the Herdt grievance was not received by the OBA General Counsel's Office until late July 2000, it was not able to be considered along with *Taylor I*. In effect, the OBA has stipulated that respondent should **not** be considered a repeat offender because of the time frame of *Taylor I* and the current matter; instead he should be viewed as one who failed to understand his responsibilities to third-party medical providers, one or more of which either have or claim an interest in settlement proceeds received on behalf of his client.

¶ 16 Other mitigating circumstances are that respondent was cooperative in the investigation of the matter, he is remorseful and accepts responsibility for his misconduct, and that prior to *Taylor I* respondent had not previously been disciplined. Respondent has been an attorney licensed to practice law in Oklahoma since May 1982. He has also agreed that should any of the medical providers owed money by Herdt sue her for recovery of the $10,000 he inappropriately advanced to her in November 1999 he will make personal restitution of the $10,000. Respondent has also implemented new office procedures designed to prevent future mis-

---

14. *State ex. rel. Oklahoma Bar Ass'n v. Taylor (Taylor I)*, 2000 OK 35, 4 P.3d 1242, involved three checks received by respondent's office from an insurance company that had a doctor listed as a co-payee on each check, along with the client and respondent. *Id.*, 2000 OK 35, ¶ 8, 4 P.3d at 1248. It was plain in *Taylor I* that the doctor had an interest in the proceeds received, yet respondent failed to notify the doctor about receipt of the settlement checks for about two months and the matter involved an unauthorized

endorsement of the doctor's signature on the checks by respondent's office. The case also involved respondent's tardiness in the disciplinary process; misleading a bar investigator; reducing, without explanation and justification, the amount the physician claimed to be due; misrepresentation by his office concerning disposition of one or more checks on which the doctor was a co-payee; and commingling funds to which the doctor—a third party—claimed an interest. *Id.*, 2000 OK 35, ¶ 34, 4 P.3d at 1255.

conduct or misunderstandings with third-party medical providers that either have an interest in settlement proceeds he receives in personal injury cases or that claim an interest in said proceeds. We also note that nothing in this matter shows or indicates respondent intentionally misappropriated any of the funds involved, but the situation is one involving his misunderstanding of the import of Rule 1.15(b)-(c), ORPC. The OBA General Counsel's Office and the PRT recommend respondent receive a public reprimand for his misconduct in the Herdt matter.[15]

## PART III. ANALYSIS.

■ ¶ 17 We initially dispose of the matter of respondent's purported violation of Rule 8.4(c), ORPC. First off, we conclude the record does not show by clear and convincing evidence that respondent made affirmative misrepresentations to the medical providers, including URHCS. At most, the record shows he failed to inform the providers he had disbursed funds to himself, Anderson and Herdt when he knew one or more of them claimed an interest in the settlement funds and when he was unaware of the proper disposition of the funds under Texas law. Also, the record shows he failed to take the steps necessary to resolve the question of entitlement to proceeds he was retaining (the URHCS co-payee/liability check and the remaining UM proceeds). We do not believe such conduct alone clearly and convincingly exhibits violation of Rule 8.4(c). Further, for conduct to constitute a violation of Rule 8.4(c) "[a] misrepresentation must be shown by clear and convincing evidence that the declarant had an underlying motive (i.e., bad or evil intent) for making the statement." *State ex rel. Oklahoma Bar Ass'n v. Johnston,* 1993 OK 91, 863 P.2d 1136, 1143. We discern from this record no such improper motive; hence, we do not find a Rule 8.4(c) violation.

■ ¶ 18 The record does, however, clearly and convincingly show violations of Rule 1.15(b) and (c). A part of the comment to Rule 1.15 provides:

> Third parties, such as a client's creditors, may have just claims against funds or other property in a lawyer's custody. A lawyer may have a duty under applicable law to protect such third-party claims against wrongful interference by the client, and accordingly may refuse to surrender the property to the client. However, a lawyer should not unilaterally assume to arbitrate a dispute between the client and the third party.

Where a lawyer knows there is a dispute over funds in his hands **and** he is unaware at the time of disbursal, under applicable law, who is actually entitled to the funds, he violates Rule 1.15(b) and/or (c) when he disburses the disputed funds to a disputant, even though in hindsight under the applicable law it might eventually be judicially decided the funds were disbursed correctly because one or more of the disputants had no valid claim to the funds or a portion thereof. *See Butler v. Commission for Lawyer Discipline,* 928 S.W.2d 659, 662–663 (Tex.App.-Corpus Christi 1996). Another way to say this is that if the lawyer has good faith doubt about who is entitled to funds coming into the lawyer's hands, he should deposit them in his trust account (or otherwise appropriately safe keep the property when it is of a kind not subject to deposit in a trust account) pending resolution of the dispute either by some fit informal methodology or, if necessary, by appropriate formal proceeding, e.g., an interpleader proceeding. Arizona Ethics Opinion 88–06 (1988) aptly states our view of the appropriate course of action for an attorney to follow in a similar, though not identical, situation to that faced by respondent.[16]

15. Although the parties seem not to have noticed it—as they do not mention it in their joint brief-in-chief and waiver of further briefs filed with this Court—the PRT did not adopt the paragraph of the joint stipulations (¶ 38) that includes the parties' agreement that respondent's conduct violated Rule 8.4(c), ORPC. In other words, as we read the PRT's report, although the PRT found violations concerning Rule 1.15(b)-(c), ORPC, the PRT did not find respondent guilty of dishonest, fraudulent or deceitful conduct in relation to his handling of the settlement funds or his interaction with the medical providers, including URHCS. The failure of the PRT to adopt ¶ 38 of the joint stipulations is without explanation in that body's written report to this Court.

16. The factual scenario in Arizona Ethics Opinion 88–06 (1988) involved an employer's workmen's compensation carrier asserting it had a

[I]f, in the circumstances (including the factual background and the lawyer's assessment of applicable law), the lawyer is satisfied that either the client or the ... claimant is entitled to receive the funds, the lawyer should pay the funds accordingly; but, if the lawyer has any good faith doubt as to who is entitled to receive the funds, the lawyer should hold the funds in trust pending resolution of the dispute or, if necessary, should commence an interpleader action or other formal proceeding to resolve the dispute.

Respondent plainly had good faith doubt about the propriety of the funds' distribution.[17]

¶ 19 Further, where there is a legitimate dispute over entitlement to funds in a lawyer's possession the attorney cannot simply hold the funds indefinitely. A lawyer's duty under Rule 1.15(b) is to "promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive". Rule 1.15(b)'s prompt delivery requirement, coupled with the lawyer's duty under Rule 1.3, ORPC to "act with reasonable diligence and promptness in representing a client" mandate that after a reasonable period of time, if no one else involved has done so, that the lawyer institute appropriate proceedings to resolve the dispute.[18] An attorney cannot simply chart a course of holding the funds "indefinitely" in a "stalemate position" when either the client or the third person are entitled to the funds or a part thereof. Arizona Ethics Opinion 88–06, *supra*, delineates the proper course to follow when it states:

[A]s a general rule, the lawyer's obligations do not permit the lawyer to hold the disputed funds in trust indefinitely without taking some action to resolve the dispute. Therefore, absent special circumstances, the lawyer may wait a reasonable period (the length of which will depend on the facts of each situation) to determine if the dispute can be informally resolved, but, if the dispute has not been informally resolved within a reasonable period (and the third person claiming an entitlement has not already initiated formal proceedings), the lawyer should take the initiative to have the dispute resolved by an interpleader action or other formal proceeding.

¶ 20 Knowing one or more of Herdt's medical providers were claiming interest in the settlement proceeds he had received, and not knowing Texas law as to exactly what their interest was or exactly how to distribute the proceeds appropriately under the law, respondent disbursed much of the proceeds to himself, Anderson and Herdt. He then embarked on a course of potentially indefinite delay with regard to the remaining proceeds he was holding even though he knew either one or more of the providers or Herdt were entitled to the bulk of the funds he had retained. As we view the record, respondent was willing to remain on this course indefinitely notwithstanding Rule 1.15(b)'s requirement that an attorney promptly deliver to the client or third person any funds or other property the client or third person is entitled to receive. Respondent's overall conduct violated both Rule 1.15(b) and (c), ORPC, conduct we cannot and will not condone.

## PART IV. DISCIPLINE.

¶ 21 In disciplinary proceedings this Court does not act as a reviewing tribunal, but as a licensing court in the exercise of our exclusive original jurisdiction. *State ex. rel. Oklahoma Bar Ass'n v. Doris, supra,* 1999 OK 94, ¶ 36, 991 P.2d at 1024–1025; *State ex rel. Oklahoma Bar Ass'n v. Downing,* 1990 OK 102, 804 P.2d 1120, 1122. Our

lien, to the extent of benefits it had paid to the attorney's client, on settlement proceeds received from the client's co-employee's liability insurance carrier.

**17.** We need not definitely decide here the appropriate disposition of the funds respondent received to gauge whether or not he violated Rule 1.15(b)-(c), ORPC. It is enough to know that he was aware one or more of the medical providers were claiming an interest in the settlement proceeds and unaware of the proper disposition of the proceeds under Texas law when he distributed the funds.

**18.** In fact, in the present case respondent had agreed with Geico's attorney he would seek court intervention with respect to the liability proceeds he had received should an informal resolution not be reached with each and every medical provider.

constitutional, nondelegable responsibility is to decide the appropriate discipline for an attorney found to have engaged in professional misconduct. *Id.; State ex rel. Oklahoma Bar Ass'n v. Barnett,* 1997 OK 61, 940 P.2d 493, 495 (Court's duty in misconduct cases is to independently determine the proper discipline).

¶ 22 Our responsibility in such matters is exercised not for the purpose of punishing an offending lawyer, but to assess their continued fitness to practice law. *Doris, supra,* 1999 OK 94, ¶ 37, 991 P.2d at 1025; *State ex rel. Oklahoma Bar Ass'n v. Meek,* 1994 OK 118, 895 P.2d 692, 699. The task must be performed to safeguard the interests of the public, the courts and the legal profession. *Id.* Before arriving at appropriate discipline, however, we must also consider the deterrent effect upon both the offending respondent and other attorneys who might contemplate similar conduct in the future. *State ex rel. Oklahoma Bar Ass'n v. McMillian,* 1989 OK 16, 770 P.2d 892, 899; *State ex rel. Oklahoma Bar Ass'n v. Hall,* 1977 OK 117, 567 P.2d 975, 978. Other properly considered factors are comparing the circumstances in the matter at hand with previous disciplinary matters, and examining an attorney's past record of professional behavior. *Doris, supra,* 1999 OK 94, ¶ 38, 991 P.2d at 1025; *Meek, supra,* 895 P.2d at 700. Mitigating circumstances, of course, may also be considered in gauging the proper measure of discipline. *State ex rel. Oklahoma Bar Ass'n v. Thomas,* 1995 OK 145, 911 P.2d 907, 913. Finally, though discipline should be administered fairly, i.e., evenhandedly, we have recognized that the extent of discipline must be decided on a case-by-case basis as each situation usually involves different transgressions and mitigating circumstances. *Doris, supra,* 1999 OK 94, ¶ 38, 991 P.2d at 1025.

¶ 23 We have found no previous disciplinary case of this Court that precisely mirrors the situation here. Many cases we have dealt with in the area of an attorney's responsibility to third-party medical providers are more egregious than the circumstances shown here and involve the situation where an attorney unequivocally agrees to pay medical providers and either fails to do so until a bar complaint is brought or for an extended period of time. *See e.g. State ex rel. Oklahoma Bar Ass'n v. Wilkins,* 1995 OK 59, 898 P.2d 147 (six month suspension warranted when attorney agrees with client to pay the client's medical bills from settlement proceeds and he fails to pay the bills until aware of complaint filed against him with OBA; other misconduct, including dishonest conduct toward client, also involved); *State ex. rel. Oklahoma Bar Ass'n v. Stormont,* 2001 OK 80, 37 P.3d 795 (attorney agrees with client to hold money from settlement proceeds to pay client's medical bills but delays for lengthy period of time in doing so suspended for eighteen—18—months). In the present situation respondent is not charged with affirmatively failing to pay a provider after he agreed to do so, but primarily with disbursing monies when he was unaware of the applicable law of a sister state as to the appropriate disposition of the funds and failing to take reasonable steps to resolve a dispute over the ultimate disposition of settlement proceeds after it became apparent the dispute was unresolvable informally.

¶ 24 As we have previously noted, the parties have stipulated that respondent has instituted office procedures designed to prevent future misconduct or misunderstandings with third-party medical providers that either have an interest in settlement proceeds he receives in personal injury cases or that claim an interest in said proceeds. Furthermore, the parties have, in effect, stipulated that respondent should not be viewed as a repeat offender by virtue of *Taylor I,* a matter in which he was suspended for thirty (30) days for similar, though not identical, conduct. Given his previous suspension and our firm conviction that it is unlikely, in the future, that respondent will engage in conduct violative of Rule 1.15, ORPC, we conclude respondent's public reprimand will serve the purposes underpinning the disciplinary process.

¶ 25 Accordingly, **RESPONDENT, MICHAEL C. TAYLOR IS HEREBY PUBLICLY REPRIMANDED AND ORDERED TO PAY THE COSTS OF THIS PROCEEDING IN THE AMOUNT OF $548.82**

WITHIN NINETY (90) DAYS FROM THE DATE THIS OPINION BECOMES FINAL.[19]

¶ 26 WATT, C.J., and HODGES, HARGRAVE, KAUGER, SUMMERS, BOUDREAU and WINCHESTER, JJ., concur.

¶ 27 OPALA, V.C.J., concurring in part; dissenting in part. I concur in declaring respondent subject to discipline; I dissent from the mild discipline imposed.

---

**19.** Rule 6.16, RGDP provides that failure of a disciplined lawyer to pay said costs within ninety (90) days after the effective date of an order imposing discipline "shall result in automatic suspension from the practice of law until further order of [this] Court."