2015 OK 22

**STATE of Oklahoma, ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Christopher I. MANSFIELD, Respondent.**

No. SCBD–6103.

Supreme Court of Oklahoma.

April 13, 2015.

Gina L. Hendryx, Oklahoma Bar Association, Oklahoma City, OK, for Complainant.

Charles F. Alden, III, Oklahoma City, OK, for Respondent.

GURICH, J.

¶ 1 On January 16, 2014, the Oklahoma Bar Association (OBA) filed a complaint against attorney Christopher I. Mansfield, alleging professional misconduct as authorized by Rule 6.1 of the Rules Governing Disciplinary Proceedings (RGDP).[1] After hearing the testimony of several witnesses and being presented with exhibits, the Professional Responsibility Tribunal (PRT) concluded that Mansfield violated Rule 3.3, Rule 8.4(c), and Rule 8.4(d) of the Oklahoma Rules of Professional Conduct (ORPC) and Rule 1.3 of the RGDP. The PRT recommended Mansfield's license to practice law be suspended for a period of eighteen months.

### Factual Background and Procedural History

¶ 2 Respondent, Christopher I. Mansfield, was admitted to practice law in Oklahoma in 2005. Since that time, Respondent has practiced primarily in Tulsa in the areas of probate, adoption, and guardianship. Respondent regularly receives guardian ad litem court appointments and court appointments in probate, adoption, and guardianship matters. The facts surrounding the Complaint filed by the OBA stem from one such court appointment.

¶ 3 On February 12, 2009, the probate of the Estate of Elizabeth S. Cox was commenced in Tulsa County. The record from the PRT hearing indicates the heirs to the Cox Estate had a long-standing acrimonious relationship with each other. On March 18, 2009, the probate judge, the Honorable Jesse Harris, appointed Respondent as Special Administrator of the Estate of Elizabeth S. Cox

to assist in sorting out the various disputes between the parties. Before his appointment to the Cox Estate, Respondent had previously been appointed to serve in at least a dozen other cases.

¶ 4 Shortly after being appointed Special Administrator of the Cox Estate, Judge Harris appointed Respondent to serve as Successor Trustee of the Elizabeth S. Cox Revocable Trust. On September 22, 2010, Judge Harris appointed Respondent as Personal Representative of the Estate of Elizabeth S. Cox. Upon being appointed Personal Representative, Respondent testified his duties expanded from "simply securing inventory and protecting [it] to—moving forward with the full probate process, . . . selling, distributing, [and] dealing with creditors claims."[2] At this point, it appears Respondent also began doing the legal work to probate the Cox Estate.[3] Respondent also hired Mr. Ed's Auction House to conduct a sale of real and personal property owned by the trust, namely a farm and the personal property thereon.[4] The property sold on or around November 30, 2010, for $530,748.43, and the money was deposited into the appropriate bank accounts. Up to this point, Respondent acted appropriately in all regards as to his administration of the Cox Estate.

¶ 5 Respondent's personal life then became tumultuous. In February of 2011, Respondent's wife informed him she had quit her job. She then began spending large amounts of money, including monthly credit card charges of between $6,000 and $12,000 dollars. In May of 2011, Respondent came home "to very abruptly discover [his wife] was having an affair."[5] Respondent testified his wife threatened to take him for every dime he had and to take his daughter if he left her, so during this time he was just

---

1. 5 O.S.2011, ch. 1, app. 1–A.

2. Transcript of Hearing at 97.

3. Transcript of Hearing at 51.

4. Respondent testified that there were four owners of the farm. "The estate owned a section, the trust owned a section and I believe each of the two heirs owned a section. . . ." Transcript of Hearing at 98. The parties agreed to deed their portions of the property to the trust so as to clean

up the title for the sale. *Id.* It's not clear from the record whether the proceeds from the sale of the farm remained in the trust or were transferred to the probate estate. Regardless, it is clear from the record that Mr. Mansfield collectively held all of the funds for the trust and the probate estate and maintained control of such. *Id.* at 30.

5. Transcript of Hearing at 127.

"trying to make ends meet and keep [his wife] happy" and provide for his three-month old daughter. Respondent began transferring money from the Cox Estate bank account to his personal bank account without prior approval from the court and without telling the heirs to the Cox Estate. Between May of 2011 and December of 2011, Respondent made six transfers of varying amounts totaling approximately $45,749.98. The record indicates the amount transferred was the amount allegedly earned for legal and statutory fees for administering the Cox Estate.[6] Divorce proceedings were filed in December of 2011, and Respondent's divorce was final in February of 2012.

¶ 6 In August of 2012, the heirs to the Cox Estate participated in a mediation to try and resolve disputes regarding distribution of the estate. Respondent was present at the mediation, and as part of the settlement agreement, he agreed to a reduced fee in the amount of $27,500.00 for his work on the estate. Respondent did not inform the parties or the mediator that he had already removed in excess of $45,000.00 in fees from the estate bank account. When questioned about why he did not disclose such information at the mediation, Respondent stated he did not intend to hide the transfers but that his mind was elsewhere with regard to the estate, specifically the monthly farm statements and accounting for the money spent on upgrading and maintaining the farm.

¶ 7 On November 21, 2012, Respondent filed his "Final Report and Final Account, Petition for Order Allowing Final Report and Final Account and Determining Heirship and Petition for Final Decree of Distribution and Discharge," ("First Final Report") wherein he stated he had agreed to a payment of $27,500.00 for fees. Respondent did not disclose to the court in this pleading that he had previously withdrawn more than $45,000.00 in legal and administrative fees from the estate account. Respondent also stated that the total amount available for distribution was $491,302.04, which was approximately $18,000.00 less than what should have been available for distribution.

¶ 8 Shortly after the First Final Report was filed, James Gotwals, the attorney for one of the heirs to the Cox Estate, requested additional supporting documentation for estate expenses listed in the final accounting. Mr. Gotwals testified that nothing in the First Final Report itself necessarily raised concerns, but up to that point, neither he nor his client had seen any documents pertaining to the sale of the farm, which constituted a majority of the assets in the estate. After Mr. Gotwals' request, Respondent provided certain documentation for estate expenses listed in the First Final Report, including a purported "Seller's Statement" from Mr. Ed's Auction House. However, before giving Mr. Gotwals the Seller's Statement, Respondent altered it to reflect an inflated and incorrect cost of $41,474.24 for property maintenance. Respondent testified he inflated the amount for property maintenance on the Seller's Statement to cover up the money he had transferred from the estate. When asked why he didn't "come clean" at that point about the previously transferred money, Respondent testified that he realized the awful mistake he had made, and in a moment of panic, he made a stupid decision.

¶ 9 Mr. Gotwals testified that when he received the Seller's Statement from Respondent, he was concerned about the amount listed for property maintenance. Although Mr. Ed's Auction House had done some things to get the property ready for sale, Mr. Gotwals testified the Seller's Statement also reflected Mr. Ed's Auction House had received a 7% commission from the sale, which amounted to $40,600.00. Mr. Gotwals was concerned about the amount of money charged for property maintenance on top of the $40,600.00 commission. Although the record is unclear as to the exact date, sometime after December 5, 2012, but before December 14, 2012, Respondent informed Mr. Gotwals that the information previously provided in the Seller's Statement was inaccurate and that there were actually more funds available for distribution. Respondent did not inform Mr. Gotwals at that time that he had transferred the money from the estate, but instead, stated Mr. Ed's had caused the

6. Transcript of Hearing at 26; Hearing Exhibits, Ex. 4.

discrepancy. On December 14, 2012, Mr. Gotwals filed an objection to the First Final Report and issued subpoenas for the estate bank records and for the Seller's Statement from Mr. Ed's.

¶ 10 The Seller's Statement Mr. Gotwals received from Mr. Ed's as a result of the subpoena reflected a property maintenance charge in the amount of $3,124.26, an amount significantly lower than the amount reflected in the Seller's Statement provided by Respondent. Upon receipt of the actual Seller's Statement from Mr. Ed's, Mr. Gotwals testified he questioned Respondent about the discrepancies, and it became apparent there was something going on. Although Mr. Gotwals testified he didn't know exactly what was going on at that point, Respondent suggested he had made some serious errors.

¶ 11 At some point after providing Mr. Gotwals with the altered Seller's Statement but before January 4, 2014, Respondent called the OBA and set up a meeting with OBA Ethics Counsel to explain what had happened. Upon the advice of the OBA Ethics Counsel, Respondent obtained legal counsel immediately. On January 4, 2013, Respondent and his counsel met with the heirs of the estate and the heirs' counsel to explain there was money missing from the Cox Estate and that Respondent was going to put the money back. On January 10, 2013, Respondent reimbursed the estate $18,249.98, the difference between the fees Respondent previously took from the estate and the $27,500.00 agreed-to fee. Respondent testified at the PRT hearing that he is awaiting a decision from the district court as to whether he was entitled to the $27,500.00 fee per the parties' settlement agreement. If he is not awarded the fee, Respondent testified he has the ability to borrow the funds to reimburse the estate.

¶ 12 On January 17, 2013, Respondent filed an Update to Final Report and Final Account with the court, wherein he advised the court that the parties had "agreed to pay the Personal Representative the sum of $27,500.00 for services rendered," but that "$18,249.98 above and beyond the agreed fee

was erroneously taken out of the Estate account."[7] Respondent also stated in the filing that the money had been refunded and that additional funds were available for distribution. Although Respondent did not state in the filing the specific details as to why the money had been erroneously taken from the estate, the record reflects that "there was a conversation with the attorneys and Judge Harris, where the skeletal version of this was presented to Judge Harris."[8] The record does not reflect when such conversation took place.

¶ 13 On January 16, 2014, the OBA filed a complaint against Respondent, alleging violations of Rules 3.3 and 8.4(c) and (d) of the ORPC and Rule 1.3 of the RGDP. The OBA brought one Count against Respondent. Count 1 of the Complaint states in relevant part:

5. On March 18, 2009, Respondent was appointed Special Administrator of the Estate of Elizabeth S. Cox aka Elizabeth Stanford Cox, Deceased, District Court in and for Tulsa County, State of Oklahoma, PB–2009–099. On May 14, 2009, Respondent was appointed as the successor trustee of the Elizabeth S. Cox Revocable Trust. On September 22, 2010, Respondent was appointed Personal Representative of the Estate of Elizabeth S. Cox. All appointments were made by the Honorable Jesse Harris, Tulsa County District Court Judge.

6. While serving in one or more of these capacities, Respondent diverted an amount in excess of $45,000.00 of estate funds to his personal use. Respondent did so with no notice to the heirs nor approval by the probate court. These transfers of fund[s] took place from May through December of 2011.

7. On November 21, 2012, Respondent filed a pleading styled *"Final Report and Final Account, Petition for Order Allowing Final Report and Final Account And Determining Heirship, And Petition For Final Decree of Distribution and Discharge* in the above referenced probate

7. Hearing Exhibits, Ex. 7.

8. Transcript of Hearing at 116–17.

matter. · Respondent made false statements to the tribunal in his pleading in that he misrepresented the total estate funds available for distribution in that he failed to account for the funds that he had previously diverted from the estate.

8. Respondent falsified a "Seller's Statement" to reflect an inflated estate expense in an effort to cover up his misappropriation of estate funds. Said document was forwarded to attorneys for the heirs. Attorney for one of the heirs questioned the provider of the service and discovered that the document had been altered to reflect a much higher cost that than actually charged and documented to the Respondent.[9]

The PRT held a hearing on April 28, 2014, and filed its report and recommendation with this Court on June 27, 2014. The PRT found Respondent violated Rule 3.3 of the ORPC by knowingly making a false statement of fact to a tribunal when Respondent filed the First Final Report with the court on November 21, 2012, Respondent violated Rule 8.4(c) and (d) of the ORPC by providing false information and falsified documents to counsel for the Cox heirs, and by his actions, Respondent violated Rule 1.3 of the RGDP. The PRT recommended Respondent's license to practice law be suspended for 18 months.

### Standard of Review

¶ 14 Review of disciplinary proceedings before the PRT is conducted by this Court using a de novo standard. *State of Okla. ex rel. Okla. Bar Ass'n v. Cox*, 2011 OK 73, ¶ 10, 257 P.3d 1005, 1008. 'As we have announced in prior decisions:

> The ultimate responsibility for deciding whether misconduct has occurred and what discipline is warranted if misconduct is found rests with [this Court] in the exercise of our exclusive original jurisdiction in bar disciplinary matters.

*State of · Okla. ex rel. Okla. Bar Ass'n v. Taylor*, 2003 OK 56, ¶ 2, 71 P.3d 18, 21, (citing *State of Okla. ex rel. Okla. Bar Ass'n v. Todd*, 1992 OK 81, ¶ 2, 833 P.2d 260, 262). Factual and legal determinations of the PRT are not binding on us, and any recommenda-

tions are merely advisory. *Id.* Likewise, we are required to ensure the ·OBA has established charges of misconduct by clear and convincing evidence. *State of Okla. ex rel. Okla. Bar Ass'n v. Kinsey*, 2009 OK 31, ¶ 13, 212 P.3d 1186, 1192. Admissions or stipulations must be supported by testimony and/or exhibits, and we will evaluate the weight and credibility ·of the evidence presented to determine if a lawyer has violated rules governing their professional conduct. *Id.*

### Analysis

### Respondent's Transfer of Money from the Cox Estate Without Prior Court Approval

¶ 15 The Probate Code vests the trial court with discretion to determine the reasonableness of any fees applied for and to approve such prior to the closure of the estate. Such discretion necessarily implies court approval for the payment of any and all fees. Section 217 of Title 58 provides:

> The special administrator must render an account, on oath of his proceedings, in like manner as other administrators are required to do. The special administrator shall be entitled to a fee to be **determined by the court in its discretion,** which fee shall in no event exceed the fee allowed to an executor or administrator pursuant to Section 527 of this title.

58 O.S.2011 § 217 (emphasis added). Section 527 of Title 58 allows for commissions to be paid to an executor and provides that "[i]n all cases such further allowance may be made, **as the judge of the district court may deem just and reasonable,** for any extraordinary service." 58 O.S.2011 § 527 (emphasis added). Section 525 of Title 58 states the administrator "shall be **allowed** all necessary expenses ·in the care, management and settlement of the estate." (emphasis added).

¶ 16 In *Estate of Bartlett*, 1984 OK 9, 680 P.2d 369, 379, we said that attorney fees "are not paid out of an estate by virtue of an employment contract." Rather, they are paid "because the personal representative is

9. Complaint at 2. ·

entitled to reimbursement for the fees necessarily incurred in administration of the estate or in litigation for the benefit of the estate." *Id.* "The personal representative may, in a proper case, seek reimbursement from the estate." *Id.* We noted that "[a]n attorney has standing to apply directly to the estate for fees, **which the trial court may grant,** even over the objection of the administrator or executor." *Id.* (emphasis added). In *In re Estate of Hughes*, 2004 OK 20, ¶ 21, 90 P.3d 1000, 1006, this Court said "the attorney fee for the personal representative lies within the **sound discretion of the probate court.**" (emphasis added). Attorneys and administrators may **apply for** both regular and extraordinary fees "any time up to and through the closing of the estate," *Matter of Estate of Siggins*, 1994 OK 40, 872 P.2d 932, 935, but orders for the allowance and payment of fees to an administrator may be contested upon the settlement of the final account of the administrator. *In re White's Estate*, 1935 OK 1202, 175 Okla. 439, 52 P.2d 1074.

¶ 17 Although the record suggests that the payment of fees from an estate prior to final court approval is a common practice in Tulsa County,[10] Oklahoma law *clearly* requires prior court approval for the payment of any and all fees for such services regardless of whether an attorney acts as special administrator, personal representative, executor, or attorney for an estate. *Probate judges and the practicing bar must exercise diligence to ensure fees are not removed from an estate without court approval.* Such practice violates the probate code and the rules of professional conduct and will not be tolerated by this Court.

¶ 18 Rule 1.15(a), ORPC provides:

a) **A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.** Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of

---

**10.** Erin Donovan, who is an experienced probate lawyer in Tulsa and who shared an office building with Respondent, testified at the PRT hearing:

Q: All right. In his direct examination, Mr. Gotwals ventured an opinion that it was necessarily and always routine perhaps that you sought executor fees or administrator fees and got court approval before they were paid.
A: Okay. For executor fees in probates?
Q: Yes.
A: Okay.
Q: So I guess my question to you is, based on your experience in the probate area, can you offer anything about that to the Trial Panel?
A: Yes, sir. I've actually seen a little bit of a change in practice. I've been practicing long enough that when I started, the typical practice with the people who trained me, was you would do your probate and when you went to court at your final hearing, you would say these are the personal representative's fees that are appropriate, these are the attorney fees that are appropriate and the court would okay them because the statute does says they have to get court approval.

What I was surprised to find out about 10 years ago that there are some firms, maybe because they're larger firms now, that require more consistent billing. There are some firms with some attorneys whom I feel are very reputable who are in this field and they have tended to bill monthly for their fees, both attorney fees and executor fees if they were serving in that capacity, always subject to the approval

of the court at the final hearing and—and I remember it so strongly, because I questioned it because I never heard that we could do that. And they said all we have to do is get them approved and if they don't—if the court doesn't approve it, we pay it back. We understand that it's subject to court approval, but for billing purposes, they would have billed them through the pendency of the proceeding.

And lately, I've also heard of that being even more of a common occurrence. I don't know that it's the majority. I don't. And I don't do that typically, but it's become a little bit more of a common occurrence because at least in Tulsa County, we have a probate judge who is very particular about getting all sorts of documentation and getting a file closed correctly and when you go to a final account hearing with him, which is what you call it when you file your final petition with a request for distribution and hopefully discharge of your estate representative, he wants to have a receipt and release from every person who's involved in this case.

. . .

Q: So would it be your view that if Chris paid himself without going to the judge first, that would not be unusual for practice in Tulsa County.
A: No, sir, because everyone understands that it's subject to the approval of the court and—
Q: So it is usual or it isn't?
A: No, it's not unusual. . . .

Transcript of Hearing at 163–64.

the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

With regard to the mishandling of funds and Rule 1.15, we have defined three levels of applicable culpability when evaluating the mishandling of funds: 1) commingling; 2) simple conversion; and 3) misappropriation. *State ex rel. Oklahoma Bar Ass'n v. Farrant,* 1994 OK 13, 867 P.2d 1279, 1284. "Commingling takes place when client monies are combined with the attorney's personal funds." *Id.* "[S]imple conversion occurs when an attorney applies a client's money to a purpose other than that for which it came to be entrusted to the lawyer." *State ex rel. Okla. Bar Ass'n v. Combs,* 2007 OK 65, 175 P.3d 340. Misappropriation, or "theft by conversion or otherwise," occurs "when an attorney has *purposely* deprived a client of money through *deceit and fraud." Id.* ¶ 16. "The degree of culpability ascends from the first to the last. Each must be proved by clear and convincing evidence." *Id.* ¶ 13. A finding that an attorney misappropriated funds, regardless of exceptional mitigating factors, mandates the imposition of harsh discipline—disbarment. *Id.*

¶ 19 In *OBA v. Keeran,* 1972 OK 50, 495 P.2d 399, Respondent was employed to perform a probate, and at the time he was employed, there was no agreement with his client as to the amount of his attorney's fee. *Id.* at ¶ 1. Over the course of his employment, "[R]espondent prepared checks for payment to himself of partial attorney's fees without application to, or order from, [the] court. He then presented those checks to the Executrix for her signature." *Id.* at ¶ 8. At the time of the hearing on the final accounting, Respondent had received approximately $18,000.00 in legal fees. Upon objection by one of the heirs to the amount of Repondent's legal fee, the probate court found that Respondent had received excess legal fees totaling approximately $4,000.00

and ordered their return to the estate. *Id.* at ¶ 3. At the final account hearing, the Respondent promised to repay the money, but he never did. *Id.* ¶ 6.

¶ 20 This Court found:

[R]espondent prepared checks for payment to himself of partial attorney's fees without application to, or order from, said court. He then presented those checks to the Executrix for her signature. **This case demonstrates the hazards of such a practice, especially where more attorney's fees have been paid than were finally authorized by court order.** If applications for them had been made to the court and orders granting the applications obtained for each partial payment, it is likely that the court never would have permitted the prepayments to amount to as large a total as the fee set forth in the Oklahoma Bar Association's minimum fee schedule, and surely would not have allowed partial payments totaling more than that minimum. **In the agreement respondent made with [the client] and her son at the aforementioned court recess, respondent, in effect, acknowledged that he had received money of his client that did not belong to him.** Under Canon 11 of the Canons of Professional Ethics, **a client's money in the possession of a lawyer 'should not under any circumstances be commingled with his own or be used by him.'**

*Id.* at 400 (emphasis added).

¶ 21 In *State ex rel. Oklahoma Bar Ass'n v. Besly,* 2006 OK 18, 136 P.3d 590, the Respondent drafted wills for two personal friends, the Bakers, and each will provided a substantial testamentary gift to Respondent of approximately $500,000.00.[11] The gift was to be be paid under the will of the Baker spouse that died last. Upon Mr. Baker's death, Respondent assumed the role of personal representative, attorney, and executrix of his estate. *Id.* ¶¶ 12–13. After Mr. Baker passed away, Respondent began managing all of Ms. Baker's personal funds through a

---

11. At the time Besley drafted the Bakers' wills, the Code of Professional Responsibility did not expressly prohibit a lawyer from drafting a will for a non-relative client that left the lawyer a substantial testamentary gift. *Id.,* ¶ 9, 136 P.3d at 596.

power of attorney and began providing provided needed care to Ms. Baker. During this time, Respondent made payments to herself from the Baker estate without court approval, totaling approximately $150,000.00. Upon Ms. Baker's death, Respondent also assumed the role of personal representative, attorney, and executrix of her estate.

¶ 22 Respondent subsequently claimed she was paying herself attorney fees for work she had actually been doing on the estate and also for time spent taking care of the personal and business affairs of Ms. Baker. She also claimed she was only paying herself out of the assets she was supposed to receive under the will, in essence, making a partial distribution of the estate. *Id.* ¶ 24. This Court held that "by paying herself under the auspices of what she considered her due as a beneficiary when the estate of Edith would be closed, **she was commingling estate funds with her own** and at a minimum as to at least some of the payments she in effect violated Rule 1.15(a), ORPC that provides in pertinent part, '[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.'" *Id.* at 606–07 (emphasis added).

¶ 23 The Court went on to state: "Neither an executrix nor an attorney doing legal work for the executrix in an estate has the authority to make distributions to a beneficiary without court approval. 'Until the county court makes an order for partial or final distribution of the estate of a decedent, the executor or administrator is without authority to deliver any of the estate to a trustee....'" *Id.* (internal citations omitted).

¶ 24 Finally, we said in *Besly:*

Respondent should also have been aware that **an administrator of an estate is without legal authority to bind the estate for a fixed sum of probate legal fees** .... [I]n the final analysis court approval is necessary because the probate court must approve the reasonableness of any attorney fee prior to closure of the estate. The question of the reasonableness of the fee is left for the trial court's sound discretion.

*Id.* n. 23 (internal citations omitted) (emphasis added).

¶ 25 In *Combs,* 2007 OK 65, 175 P.3d 340, the Respondent was hired to probate an estate and was paid a retainer. Respondent also filed a wrongful death suit in connection with the probate estate and entered into a contingent fee agreement with the personal representative of the estate with regard to the wrongful death suit. Respondent was to receive 35% of any settlement and the estate would receive 65%. Respondent settled the wrongful death suit and deposited the settlement proceeds into his trust account. Respondent then, because of a miscommunication with his staff, inadvertently deposited almost the entire settlement amount into his operating account and used the money for personal expenses. This Court found there was no evidence that Respondent purposely deprived the personal representative or the estate of the funds by deceit or fraud or that Respondent intentionally inflicted grave economic harm upon the estate. This Court did find, however, evidence of commingling and simple conversion when Respondent "transferred the money from the trust account to his operating account and used the money for personal expenses." *Id.* ¶ 17, 175 P.3d at 347.

¶ 26 In *State ex rel. Oklahoma Bar Ass'n v. Parsons,* 2002 OK 72, 57 P.3d 865, Respondent represented a family injured in a car accident. Respondent secured a settlement with the company who had leased the car, and upon receiving the settlement check, Respondent paid himself an attorney fee and paid his clients the remaining money from the settlement. However, Respondent had previously secured an agreement from a chiropractor, to which the Reed Family owed medical bills, to discount the amount of his claim against the Reeds if a settlement was reached. In reviewing Respondent's handling of the settlement funds, the Court found it was unclear whether Respondent and the chiropractor had entered into any agreement as to the manner in which they would divide any recovery in the case. And because Respondent may have legitimately been entitled to the attorney fee, the Court found the record did not establish by clear and convincing evidence that the Respondent

intended to misappropriate the chiropractor's portion of the settlement funds through deceit and fraud. However, this Court found that Respondent commingled and converted the funds.

¶ 27 In *State ex rel. Oklahoma Bar Ass'n v. Moore,* 1987 OK 21, 741 P.2d 445, Respondent acted as executor of an estate. Respondent altered a check to make it payable to himself, signed the names of two co-executors to checks on the estate account, borrowed money on his own signature as co-executor pledging assets of the estate as security from a bank which would not loan Respondent money in his own name, and transferred money from the estate account to his own account. Respondent had not earned any of the more than $475,000.00 taken from the estate and admitted he had "borrowed" the money from the estate and had used the money for personal obligations. This Court found Moore misappropriated client funds.

¶ 28 In the case before us, Respondent testified as follows with regard to the transfer of funds:

Q: And then beginning in May of 2011, about a year and some four months later, you began transferring monies out of that account for your personal use, isn't that correct?

A: Yes, ma'am.

Q: And if the records are correct . . . the first one that the records indicates May 3rd, Internet transfer to checking of $12,000. Do you see that?

A: Yes, ma'am.

Q: Was that your transfer?

A: Yes, ma'am.

Q: Did you transfer it to your personal account for personal use?

A: Yes.

Q: Did you have court approval to do so?

A: I did not.

Q: Did you notify the heirs that you were going to do so?

A: No, ma'am.

Q: Did you tell them afterwards that you had done so?

A: No.

Q: And did you ask for the court approval to have done so with regard for that transfer?

A: I did not ma'am, and my answer will be the same for all of those transfers, ma'am?

Q: So would the answers be the same that you've just given, to the same questions, for the transfer that occurred on June 15th in the amount of $5,000?

A: Yes, ma'am.

Q: You would agree with me, that that was improper?

A: Yes, ma'am.

Q: Should have sought court approval.

A: Yes, ma'am.

Transcript of Hearing at 100–01.

Respondent also testified:

Q: Okay. The monies that you took out of the estate account in 2011, those six or seven transactions over several months, was that money spent pretty much as quickly as you took it out?

A: If not quicker.

Q: So by the end of 2011, that money had been spent and was gone.

A: Yes.

Q: So the $27,500 you're currently holding that you could refund, was not those original dollars.

A: No, ma'am. I don't—I have gotten approval from a friend who would loan it to me if I needed to.

Transcript of Hearing at 137.

¶ 29 The record also reflects that after Respondent had transferred the money, the parties agreed at mediation to reduce his fee by approximately $18,000.00. Because he had already transferred the entire fee into his personal account, he received money to which he was not entitled and was then required to repay the overage. Respondent's conduct, without a doubt, amounted to commingling of funds in violation of ORPC Rule 1.15.[12] However, Respondent also testi-

12. *See Besly,* 2006 OK 18, 136 P.3d 590; *Keeran,* 1972 OK 50, 495 P.2d 399.

fied that such funds were immediately converted to pay his personal credit card balance. Respondent's conduct also amounted to simple conversion in violation of ORPC Rule 1.15.[13]

¶ 30 The more difficult question is whether Respondent misappropriated the funds. Respondent admitted that his transfer of funds from the Cox Estate was improper and that he should have received court approval before doing so. Respondent also admitted he did not notify any of the heirs to the Cox Estate of his transfers. And we cannot ignore that a year and a half passed before Respondent informed the parties and the probate court that he had previously taken fees from the Cox Estate. In spite of this, we do not find clear and convincing evidence that Respondent's conduct rose to the level of misappropriation. As was the case in *Parsons*, the amount transferred from the Cox Estate—$45,749.98—was for legal and statutory fees already earned by Respondent. Had Respondent sought court approval for the payment of such fees, we have no reason to believe that the application would not have been approved by the probate court. Additionally, we do not find any evidence in the record that Respondent sought to intentionally inflict grave economic harm upon the Cox Estate. Upon our review of the record, we do not find clear and convincing evidence that Respondent's conduct amounted to misappropriation.

¶ 31 Although Respondent argued in his initial response to the OBA's inquiries that he "never represented anyone involved in the underlying matters, as lawyer," [14] and continued to press such argument at the PRT hearing, the record clearly demonstrates that after being appointed Personal Representa-

tive of the Cox Estate, he hired himself to probate the Cox Estate.[15] In the First Final Report filed on November 21, 2012, he states he "rendered legal services to the estate in the amount of $31,547.50." [16] Attorneys are subject to the ORPC regardless of what role they play in the administration of an estate, and it makes no difference in our view that Respondent may not have technically represented any client with regard to the administration of the Cox Estate. As an attorney acting as Personal Representative of the Cox Estate and doing legal work on behalf of himself as the Personal Representative, and as an attorney serving as trustee of the Cox Trust, Respondent no doubt was entrusted with money belonging to the Cox Estate and its heirs. He maintained complete control over all funds coming in and out of the Cox Estate.[17] Rule 1.15 applies to lawyers who "hold property of clients **or third persons**" in connection with a representation, and under Rule 1.15, Respondent had a duty to safeguard such funds and keep them separate from his own.

¶ 32 Although the OBA did not cite Rule 1.15 of the ORPC in its complaint, the OBA alleged facts sufficient to put Respondent "on notice of the conduct upon which the charges of professional misconduct" were based, namely that "Respondent diverted an amount in excess of $45,000.00 of estate funds to his personal use ... [and] did so with no notice to the heirs nor approval by the probate court." [18] "It is the duty of this court, not that of the parties by stipulation or otherwise, to examine the facts de novo and **determine which ethical rules are applicable.**" *Id.* (emphasis added). The record in this case reveals clear and convincing evidence that Respondent's transfer of funds

13. *See Combs*, 2007 OK 65, 175 P.3d 340.

14. Hearing Exhibits, Ex. 3.

15. Transcript of Hearing at 51. Counsel for Respondent questioned Mr. Gotwals as follows:

 Q: Now, on this issues of the statement contained in various filings that were referred to as attorney fees, did Chris [Mansfield] represent anybody—did Chris Mansfield represent anybody in this probate?
 A: He represented the estate.
 Q: But not as lawyer, right?

 A: Yes, as a lawyer, he hired himself to represent—I mean he asked for legal fees. You're entitled as an executor to get legal fees and I presumed he was serving as his own lawyer. He was authorized to hire a lawyer initially—
 A: All right.

16. Hearing Exhibits, Ex. 4.

17. Transcript of Hearing at 30.

18. Complaint at 2. *See also OBA v. Minter*, 2001 OK 69, 37 P.3d 763, 773–74.

from the Cox Estate without prior court approval amounted to commingling and simple conversion in violation of Rule 1.15 of the ORPC.

### The First Final Report and Final Account Filed November 21, 2012

¶ 33 ORPC Rule 3.3—Candor Toward the Tribunal—states in relevant part:

(a) A lawyer shall not knowingly:

(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

(c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

■ ¶ 34 Respondent does not dispute that the filing of the First Final Report on November 21, 2012, amounted to a violation of Rule 3.3 of the ORPC.[19] Despite this acknowledgment, we are bound to review the record to ensure allegations of misconduct are supported by clear and convincing evidence. *State of Okla. ex rel. Okla. Bar Ass'n v. Conrady*, 2012 OK 29, ¶ 8, 275 P.3d 133, 136. The record reflects on that November 21, 2012, Respondent filed the First Final Report, wherein he stated he had agreed to a payment of $27,500.00 for fees and asked that such fees be approved. Respondent did not disclose to the court in this pleading that he had previously withdrawn more than $45,000.00 in fees from the estate account. Respondent also stated the total amount available for distribution was $491,302.04, which was approximately $18,000.00 less than what should have been available for distribution. Despite being fully aware that the numbers included in the First Final Report were incorrect, Respondent's sworn statement at the end of the First Final Report recites that "the statements and allegations

therein contained are true and correct."[20] We find clear and convincing evidence that by filing the First Final Report on November 21, 2012, Respondent knowingly made a false statement to the court in violation of Rule 3.3(a) of the ORPC.[21] *See State ex rel. Oklahoma Bar Ass'n v. Layton*, 2014 OK 21, ¶ 27, 324 P.3d 1244, 1255 (citing *State ex rel. Oklahoma Bar Ass'n v. Krug*, 2004 OK 28, 92 P.3d 67) ("Under Rule 3.3(a), as long as the lawyer has actual knowledge of a false statement of fact or law, no inquiry need be made as to his or her motivation for making the false statement.").

### The Altered Seller's Statement

■ ¶ 35 ORPC Rule 8.4(c) states: "It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation." This Court has held that for conduct to constitute a violation of Rule 8.4(c), "[a] misrepresentation must be shown by clear and convincing evidence that the declarant had an **underlying motive (i.e., bad or evil intent)** for making the statement." (emphasis added). *OBA v. Taylor*, 2003 OK 56, ¶ 17, 71 P.3d 18, 27. Misconduct does not violate Rule 8.4(c) unless the record clearly and convincingly shows respondent had an intent or purpose to deceive when he or she made the representations. *OBA v. Besly*, 2006 OK 18, ¶ 42, 136 P.3d 590, 605.

■ ¶ 36 Respondent does not dispute that altering the Seller's Statement and submitting such to Mr. Gotwals violated Rule 8.4(c) of the ORPC.[22] But again, we are bound to review the record to ensure allegations of misconduct are supported by clear and convincing evidence. Respondent testified as follows at the PRT hearing:

Q: I want to turn over to the Seller's Statement with regard to sale of the real property. This is—

A: Yes.

did not amount to fraudulent conduct in violation of ORPC Rule 8.4(c).

19. Respondent's Brief at 9.

20. Hearing Exhibits, Ex. 4.

21. The PRT also found that Respondent's filing of the First Final Report on November 21, 2012,

22. Respondent's Brief at 9.

Q: Exhibit Number 5. Did you provide this document to Mr. Gotwals?

A: Yes, ma'am.

Q: Do you see the line that he questioned for property maintenance at $41,474.24?

A: Yes, ma'am.

Q: Did you change that number?

A: Yes, ma'am.

Q: Did you inflate that number?

A: Yes, ma'am.

Q: Did you do that to cover up for the amount that you had taken out of the estate in 2011?

A: Yes, ma'am.[23]

We find the record clearly and convincingly shows Respondent no doubt had an intent or purpose to deceive when he altered and sent the Seller's Statement to Mr. Gotwals.

¶ 37 ORPC Rule 8.4(d) provides it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." To establish a violation of ORPC 8.4(d), "[t]he interference contemplated must be serious" and must include some element of "deceit, dishonesty, misrepresentation, criminality, sexual misbehavior or other morally reprehensible conduct." *State ex rel. Oklahoma Bar Association v. Bourne*, 1994 OK 78, ¶ 8, 880 P.2d 360, 362. "Rule 8.4(d) may not be used to establish professional misconduct unless the complained acts were the sort that were previously disapproved by case law, statute, court rules or the 'lore of the profession.'" *State ex rel. Oklahoma Bar Association v. Spadafora*, 1998 OK 28, ¶ 38, 957 P.2d 114, 120.[24] Respondent testified he altered the Seller's Statement to cover up for the amounts he had taken out of the estate between May of 2011 and December of 2011. Mr. Gotwals testified that Respondent's actions have caused his client, one of the heirs to the Cox estate, increased legal fees and that his client "has spent a whole lot of

money discovering this information, subpoenaing it, going to court, and we're not done yet." Tr. 48:1–9. The record clearly and convincingly establishes that Respondent's alteration of the Seller's Statement involved deceit, dishonesty, and misrepresentation and was a serious interference with the administration of justice in violation of ORPC 8.4(d).

¶ 38 Rule 1.3 of the RGDP provides:

The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

We find clear and convincing evidence that Respondent violated RGDP Rule 1.3 by acting contrary to prescribed standards of conduct when he altered the Seller's Statement to cover up for the amount he had taken out of the estate between May of 2011 and December of 2011.

### Additional Conduct During the Time Period in Question

¶ 39 Although it is the duty of this Court to examine the facts alleged in the complaint and determine which *ethical rules* are applicable, the Complaint must contain facts sufficient to put the accused lawyer on notice of the conduct upon which the charges of professional misconduct are based. *OBA v. Minter*, 2001 OK 69, ¶ 23, 37 P.3d 763, 773–74. Although the Complaint in this case referenced Respondent's transfer of funds without court approval, the First Final Account filed on November, 21, 2012, and the altered Seller's Statement, the Complaint in this case did *not* include factual allegations

---

23. Hearing Transcript at 111.

24. This Court has previously disciplined lawyers under ORPC 8.4(d) for forging, falsifying, or altering documents. *See, e.g., State ex rel. Okla. Bar Ass'n v. Bednar*, 2013 OK 22, 299 P.3d 488 (disciplining lawyer under 8.4(d) for altering a Final Joint Pretrial Report and putting opposing counsel's electronic signature on it without his consent); *State ex rel. Okla. Bar Ass'n v. Gassaway*, 2008 OK 60, 196 P.3d 495 (disciplining lawyer under 8.4(d) for falsely writing "wavier on file" on husband's signature block in divorce decree when husband had not been properly notified of the divorce proceeding).

regarding Respondent's conduct during the mediation in August of 2012. However, in its brief to this Court, the OBA alleges Respondent breached his fiduciary duty to the estate based on his conduct at the mediation, and Respondent was questioned at the PRT hearing about his actions at the mediation, specifically, whether he "[told] anyone in the room, the mediator or the other parties, that [he] had already removed over $45,000 [in] fees from those accounts." [25] Likewise, the Complaint did *not* include factual allegations regarding Respondent's filing of the Update to the final Report and Final Account on January 16, 2013, yet in its brief to this Court, the OBA argues that Respondent violated Rule 3.3 when he filed such document because he did not make a full disclosure concerning the transferred funds in his updated pleading. At the hearing before the PRT, Respondent was questioned by the OBA general counsel about the Update to the Final Report and Final Account filed on January 16, 2013, and whether he "came clean" to the court in that document. [26]

¶ 40 Although Respondent was first put on notice at the PRT hearing that the OBA was seeking discipline for such conduct, Respondent did not object to the OBA's questioning at the PRT hearing. As such, he waived any

---

error with regard to the OBA's failure to allege relevant facts in the complaint. *OBA v. Eakin*, 1995 OK 106, 914 P.2d 644. Regardless, we do not find clear and convincing evidence in the record that Respondent's conduct during the mediation or Respondent's filing of the Update to the final Report and Final Account on January 16, 2013, violated the ORPC. As such, we will not consider such conduct in formulating the discipline in this case. [27]

### Mitigating Evidence

¶ 41 Respondent has practiced since 2005 and has had no previous formal discipline by the OBA. Prior to the filing of any complaint, Respondent contacted the OBA to discuss his conduct, and upon speaking with ethics counsel, immediately secured legal counsel. Within a month or so of sending the altered Seller's Statement, Respondent and his attorney met with the heirs of the estate and their attorneys to explain what had happened. Respondent shortly thereafter disclosed his conduct to the probate court and refunded at least a portion of the money that had been taken from the estate account. Although the $27,500.00 legal fee has not yet been refunded, Respondent testified he has the ability to repay the fee if the court determines he was

---

25. Transcript of Hearing at 104.

26. Transcript of Hearing at 115.

27. With regard to Respondent's conduct at the mediation that occurred in August of 2012, the OBA alleges that Respondent violated his fiduciary duty to the estate when he agreed to a fee of $27,500.00 at the mediation without notifying the parties of his prior transfers of funds. The record is unclear, as well it should be, as to what actually happened at the mediation with regard to the confidential negotiations and settlement reached by the parties. Although Respondent agreed he did not notify the parties at the mediation that he had already transferred fees from the estate account and agreed he probably should have, the record is clear that the underlying case was contentious and that the parties were trying to come to an agreement at the mediation regarding expenditures related to the farm. We do not find clear and convincing evidence that Respondent's conduct at the mediation violated the ORPC.

With regard to Respondent's filing of the Update to the Final Report and Final Account on January 16, 2013, the OBA relies on Comment 3

to Rule 3.3 to argue that Respondent should have disclosed his misconduct in detail to the probate court when he filed the updated final account. Although Respondent agreed with the General Counsel at the PRT hearing that he did not lay out all the facts in detail within the January 16 filing, Respondent testified there was a discussion with the probate judge and all the attorneys involved with regard to Respondent's conduct. Nothing in Rule 3.3 or the comments to Rule 3.3 specifically requires that a lawyer correct a false statement to the court through a *filed* document. Although the record is unclear what exactly was disclosed to the court regarding Respondent's conduct, it appears Respondent's conduct was *disclosed* to the probate judge. Additionally, although Respondent did not discuss the situation in detail in the filing, he did state that "$18,-249.98 above and beyond the agreed fee was erroneously taken out of the Estate account," and that the money had been deposited back into the Estate account. Hearing Exhibits, Ex. 7. We do not find clear and convincing evidence that Respondent failed to correct his false statements to the court in violation of Rule 3.3 when he filed the Update to the Final Report and Final Account on January 16, 2013.

not entitled to it. Respondent cooperated fully with the OBA during its investigation.

¶ 42 We also note that in 2010, Respondent was named Guardian Ad Litem of the Year by the Family Law Section of the OBA. And even after Respondent's conduct was disclosed to the probate judge, that same judge has appointed Respondent to serve in subsequent cases, indicating the judge believes Respondent's behavior was an isolated incident and will not happen again.[28] Although Respondent was dealing with difficult personal circumstances when he made the transfers from the estate account, Respondent testified that those circumstances were not an excuse for his behavior. Respondent took full responsibility for his actions and admitted his conduct was wrong.

¶ 43 Ms. Donovan, who is an experienced probate lawyer in Tulsa and who shared an office building with Respondent, testified at the PRT hearing that she has known Respondent for approximately eight years. Ms. Donovan testified that over the last eight years she has gotten to know Respondent well because they occasionally worked together on cases and have similar practices. She testified that Respondent has been recognized as a go-to person for both guardianship and adoption cases in Tulsa. Ms. Donovan stated one of the things that struck her about Respondent was that he seemed to have the same kind of nurturing approach to clients that she did and that when he was involved in a guardianship with an elderly client, he would go out and see the client on the weekends to check on his or her well-being. Ms. Donovan testified she was so impressed with the way he takes care of his clients that she plans to groom him to take over her existing probate practice when she retires. She testified she still plans to do this regardless of whether he is suspended

for his conduct with regard to the Cox Estate. Ms. Donovan also testified Respondent was very distraught about his actions and despite what happened in this case, she believes Respondent is an honest person and is fit to practice law. She testified she is convinced this was a one-time incident and will not happen again.

¶ 44 Mr. Gotwals also testified he had known Respondent since Respondent began practicing law and that he believed his conduct during the probate of the Cox Estate was uncharacteristic of him. Mr. Gotwals testified Respondent came to his office and apologized to him and his associate for putting them in the position they were in and stated he would do whatever it took to earn back their respect. Mr. Gotwals testified he did not doubt Respondent's sincerity.[29]

### Discipline

 ¶ 45 The goal in bar disciplinary matters is not to punish an attorney for his or her prior conduct, but to "safeguard the interest of the public, of the courts, and of the legal profession." *State of Oklahoma ex rel. Okla. Bar Ass'n v. Albert,* 2007 OK 31, ¶ 11, 163 P.3d 527, 532–533. With this purpose in mind, we must weigh all relevant factors including those that mitigate the severity of discipline and those that justify severe sanctions. *State of Oklahoma ex rel. Okla. Bar Ass'n v. Stewart,* 2003 OK 13, ¶ 19, 71 P.3d 1, 4. We must also weigh the deterrent effect upon the Respondent and the Oklahoma Bar as a whole. *Taylor,* ¶ 22, 71 P.3d at 29. The discipline imposed should be consistent with that imposed for similar acts of misconduct. *Stewart,* 2003 OK 13, ¶ 19, 71 P.3d at 4.

¶ 46 The discipline in the cases discussed above ranged from a 90–day suspension to disbarment. In *Combs,* the Respondent mis-

---

**28.** We are concerned that the probate judge put Respondent in a position to wear so many hats with regard to the administration of the Cox Estate. While the record indicates the court fully trusted Respondent to ethically perform his duties in all respects, Respondent served as special administrator, personal representative, and attorney to the Cox Estate as well as trustee to the Cox Trust. Mr. Mansfield alone was responsible for funds being taken in and out of the accounts and transferred between his account

and the Cox Estate. Although the interests of the trust and the interests of the probate estate may have been aligned in this case, such is not always the case, and lawyers and judges should exercise diligence in ensuring no conflicts of interest exist with regard to appointment(s) and legal representation in the administration of an estate.

**29.** Transcript of Hearing at 71–72.

handled funds in two separate matters, and the Court found such conduct amounted to commingling and simple conversion in violation of Rule 1.15. Respondent had not been previously disciplined, and the Court suspended him for ninety days. In *Besly*, the Respondent paid herself approximately $150,000 in legal fees from the estate without court approval. This Court found such conduct amounted to commingling and was a violation of Rule 1.15 of the ORPC. In that case, the Court also found Respondent violated Rule 8.4(c) of the ORPC when she falsely testified at her deposition that she did not make any payments to herself from estate money. The Court also found Respondent violated Rules 1.1, 1.3, and 3.2, by failing to competently and diligently represent the estates; Rules 1.4, RGDP and Rule 1.15(b) for failing to promptly account for and deliver estate property; Rule 5.2 RGDP for failing to timely respond to the grievance lodged against her; and Rule 8.1(b), ORPC for failing to produce documents requested by a subpoena. In *Besly*, Respondent had been given a previous private reprimand for neglect in two probate matters and for failing to respond to the grievance. This Court suspended the Respondent in *Besly* for six months.

¶ 47 In *Keeran*, the attorney paid himself legal fees from the estate without prior court approval, and upon seeking approval, the court found he had been overpaid by approximately $4,000. This Court found such conduct amounted to commingling. In *Keeran*, the attorney never repaid the money to the client despite representing on several occasions that a check had been sent. The Respondent had no prior discipline, and this Court suspended him from the practice of law for one year. In *Parsons*, the Respondent was found to have commingled and converted settlement funds received on behalf of a client in violation of Rule 1.15. The attorney had not been previously disciplined, and this Court suspended him from the practice of law for one year. In *Moore*, the attorney was found to have misappropriated client funds in violation of Rule 1.15 when he took more than $475,000 from an estate and used it for personal obligations. The Court also found that Moore, personally or through his office, had provided a fraudulent tax release to the heir of a different estate showing the Oklahoma estate taxes had been paid and that Moore was negligent in handling a separate lawsuit unrelated to the estates. The Court disbarred Moore.

¶ 48 In the case before us, although we are persuaded from the record that Respondent's conduct was an isolated incident and is not likely to happen again, we simply cannot ignore Respondent's attempt to cover up his mishandling of fees and the seriousness of those actions. Almost two years passed before Respondent fully disclosed his conduct to the parties and the probate court, and apparently, he only did so at that point because Mr. Gotwals and his client began asking questions and seeking information regarding the amount of funds available in the estate. Respondent's actions not only created more litigation for the heirs to the Cox Estate, but compounded an already embittered situation. Considering the discipline administered in similar cases and evidence offered in mitigation, we agree with the PRT that eighteen months is an appropriate suspension.

### Conclusion

¶ 49 Respondent Christopher I. Mansfield is suspended for a period of eighteen months. Respondent is ordered to pay the costs of this proceeding in the amount of $1,113.40 within ninety (90) days after the effective date of this opinion or be automatically suspended from the practice of law per RGDP Rule 6.16.

**RESPONDENT SUSPENDED FROM THE PRACTICE OF LAW FOR EIGHTEEN MONTHS; COSTS IMPOSED.**

¶ 50 REIF, C.J., COMBS, V.C.J., KAUGER, WINCHESTER, EDMONDSON and GURICH, JJ., concur.

¶ 51 WATT and COLBERT, JJ., concur in part and dissent in part.

TAYLOR, J., dissents.

¶ 52 I would disbar the respondent.